VINCENT YARDUM, EXECUTOR, APPELLEE, V. THOMAS H. EVANS, APPELLANT.

FILED FEBRUARY 20, 1931. No. 27489.

*Webb Rice* and *Forrest Lear*, for appellant.

*Mapes, McDuffee & Mapes, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

GOSS, C. J.

This is a suit in equity brought by an executor claiming ownership and the right to the possession of personal property alleged to belong to the estate. The defendant appealed from a decree in favor of the executor.

The petition of the executor, filed September 3, 1928, alleges that Armenag B. Tashjean died testate on May 27, 1928, and plaintiff is the executor; that for more than two years prior to his death the testator was ill and infirm and during said period the defendant acted as his

agent and confidential adviser in the handling of securities and in selling real estate; that thereby the defendant secured possession of certain specifically described personal property, consisting of time certificates of deposit, government bonds and certificates and a real estate note and mortgage, all of a total face value of $29,500; that the testator suffered a severe stroke of paralysis on May 25, 1928, and from that time on was dying, and defendant claims that on May 26, 1928, the testator gave said property to defendant in contemplation of death. But plaintiff alleges that neither at the time defendant claims the property was given him nor at any other time was there any gift or any delivery of said property, that no indorsements were made by Tashjean on any of the securities, and that Tashjean was incompetent, by reason of his physical and mental condition, to give the property to defendant. Plaintiff alleges that he duly brought action in replevin to secure possession of the property, and the defendant refused to deliver it to the sheriff or to disclose where it was, though admitting its possession; and resisted a citation to go into court and submit to an examination as to its whereabouts; that the property is liquid and liable to be transferred out of the jurisdiction. Wherefore plaintiff prays for a decree that plaintiff, as executor, is the owner and entitled to the possession, that a receiver be appointed to take charge of the property until the ownership has been determined by the court, and that the defendant be enjoined from transferring, removing and secreting the property.

The parties stipulated in writing that the application for a receiver should be sustained. A receiver was appointed and evidently took over the property and holds it and the proceeds of some that was sold, subject to the ultimate disposition of the court.

By the amended answer of the defendant it is admitted that the defendant has possession of the securities described in the petition, but defendant avers that he is the owner thereof by gift from Armenag B. Tashjean during

his lifetime. It is admitted that the securities given defendant by Armenag B. Tashjean, who was popularly called Dr. Tashjean, do not bear his indorsement, and that defendant has no written assignment of them, but it is alleged that Dr. Tashjean intended to indorse them and offered to indorse them at the times of their respective deliveries, which times are set out, and would have done so had defendant then consented to accept said securities as a completed gift, and that they were not indorsed solely because of defendant's request to the donor not to indorse them at the time they were delivered, at which time defendant accepted them subject to the condition that Dr. Tashjean might need them for his own use before his death; that later, about the middle of May, 1928, Dr. Tashjean requested defendant to bring the treasury certificates for his indorsement, so that defendant could cash them and use the funds, and defendant then showed Dr. Tashjean that they would not begin to mature until August and suggested that they be not indorsed until then, and so they were not indorsed; that on May 26, 1928, after the stroke of paralysis on the preceding day, Dr. Tashjean called defendant to his bedside, told him he wanted him to keep for himself the securities theretofore given him, and also the money on his person when he was stricken, and avers that he was then physically unable to indorse the securities; and "that the gift of said securities to defendant was fully completed without indorsement, and that said gift was a gift *causa mortis.*"

The reply consists of a general denial and of specific allegations that, on the several dates named in 1928, Dr. Tashjean was not possessed of sufficient mental capacity to transact the business alleged in the amended answer.

The decree of the district court finds that the evidence is insufficient to sustain defendant's claim of a gift of the property, that the alleged donor was mentally incompetent to make a gift *causa mortis* on May 26, 1928, and that plaintiff is entitled to the possession of the property. Judgment was entered, directing the receiver to turn over

to plaintiff the property remaining and the proceeds of any part sold.

In this case, as is usual in those of its type, there is not so much difficulty about the law as about the evidence. In an unusual sense each case is ruled by its own facts. Once the truth is discerned, it is not so hard to find the applicable rules of the law.

At the time of his death Armenag B. Tashjean was probably somewhat more than 70 years of age. An Armenian by birth, he had come to Norfolk about 40 years earlier and there had practiced his profession as a doctor until about two years before his death, when he suffered a stroke of paralysis. The evidence shows that for some years his power of locomotion was impaired so that he took very short steps, without lifting his feet, in order to preserve his balance when walking; that he did not have very good control of his bowels, and that his urinary tract was likewise affected. About the time he retired from business, he had sold his home, in which he also maintained his office, and, while in Norfolk, made his home chiefly at a hotel. For a few weeks in that period he had lived at the home of defendant, who testified he is an auditor, insurance and real estate man, who had sold the doctor's home for him and who had acted for the doctor in some of his transactions concerning his securities. By frugality the doctor had accumulated considerable personal property, and retired with approximately $100,000.

Vincent Yardum, the executor, lives in Scarsdale, a suburb of New York City. He is a lawyer with offices in the city. Mrs. Yardum, also born in Armenia, is a cousin of Dr. Tashjean. Her father was his mother's youngest brother. When Mrs. Yardum testified, she was 36 years old. She states that her own mother died when she was two weeks old and she was then adopted by the doctor's mother. She came to this country when she was 13. At first she lived a few years in California and then two years in Michigan, after which she lived in Nebraska. The doctor paid her bills from the time she first arrived

in this country. He sent her to Lincoln to college. After a few years she went to New York and was married to Vincent Yardum in 1917. They have three children, boys, ranging from ten years down to three. Several years before his death the doctor visited the Yardums in their home. At another time they visited him in Buffalo, where he had gone for rest and treatment in a private hospital. In November, 1927, they came to Norfolk and took him back to their New York home, where he remained until the last of February, 1928, when he returned to Norfolk and remained until the end. While at the Yardums he gave $40,000 to the family—$13,000 each to Mr. and Mrs. Yardum and $14,000 to the parents in trust for their three boys. Mrs. Yardum also testified that he gave her $500 just before leaving for Nebraska. On November 3, 1927, he made his last will and testament, which has been duly probated in Madison county, Nebraska, and is the authority on which the plaintiff acts as executor. This will was executed in Norfolk and was sent by Dr. Tashjean to Yardum. It devised and bequeathed all his remaining property to the Yardums and their three sons, share and share alike.

By reason of the state of the pleadings which we have shown, and by reason of the relationship between the parties, the defendant had the burden of showing the gift of the securities to him by Dr. Tashjean during the latter's lifetime. Had the defendant offered no evidence, judgment would have had to be for the plaintiff on the pleadings. Defendant had admitted in his amended answer that he was in possession of all the securities described in the petition, that they were unindorsed, that they were given him by Dr. Tashjean, and had alleged that the gift was fully completed without indorsement and was a gift *causa mortis*. The law casts the burden of proof upon the donee. Possession of the property by the alleged donor, after the death of the latter, raised no presumption of ownership in the alleged donee. 12 R. C. L. 971, sec. 44. So, on the defense, on direct examination,

separate suitable questions were propounded to the defen-
dant, seeking to elicit from him as a witness the times
when he came into possession of the several securities.
To each such question objection was interposed, on behalf
of the plaintiff, that the evidence was incompetent and
that the defendant was an incompetent witness under the
statute, the plaintiff being the representative of Dr. Tash-
jean, who is deceased. The objection was sustained to
each question he asked and to stated offers of proof by
the witness on the exact date when the particular securi-
ty in question came into his possession. It is assigned
that the court erred in excluding this line of testimony
offered by the defendant and that section 8836, Comp. St.
1922, section 20-1202, Comp. St. 1929, does not inhibit
testimony of the defendant as to proof of the dates when
the securities came into his possession. This section in-
hibits defendant from testifying to "any transaction or
conversation" between him and deceased, unless plaintiff
shall have offered testimony of the deceased or of a wit-
ness in regard to "such transaction or conversation." No
such evidence has been offered by the plaintiff, so the
evidence was not admissible on the ground, permitted by
the statute, that it had been opened up by plaintiff. Hence,
if the proof of the dates when the securities came into
his possession relates to a "transaction" with the deceased,
it was inadmissible. It does not always follow that the
date when one gets possession, or has possession, of prop-
erty belonging to or coming from one who has since died
relates to a transaction between such party and the de-
ceased, but in view of the defendant's amended answer
there can be no ground for debate there. The fourth para-
graph of defendant's amended answer alleges that Dr.
Tashjean "delivered" the securities to defendant at the
Travelers hotel in Norfolk and then specifies the dates
when particular securities were so given him by the de-
ceased. If the deceased delivered the securities no one
else did, and so an offer to prove their date of delivery

was an offer to prove a part of a transaction with the deceased.

Likewise, defendant asserts error on the part of the trial court in excluding certain testimony of Mr. Lear, one of his attorneys. The defendant and Neighbor, who was used as a witness for plaintiff, went to the office of Mr. Lear on Monday, May 28, 1928. Defendant had expressed an intention to consult the attorney about what he should do about the $39,000 of Dr. Tashjean's money, so Neighbor had testified, and that he went along with defendant. Defendant introduced Neighbor to Lear as one who "also has a claim to file against the estate for services." Mr. Lear advised them about the probate procedure, and then the testimony of Neighbor shows this question and answer: "Q. Anything said at that time about a gift? A. Nothing whatever." Mr. George Tannehill, also a witness for plaintiff, testified that he met defendant on the street a day or so after the death and asked him what the doctor "did with his money—who he give it to? And he said he didn't know." In this state of the evidence Mr. Lear, while on the stand on rebuttal for the defendant, was asked, but on objection was not allowed to tell, about a conversation alone with defendant at the office of the witness on Saturday afternoon, May 26, 1928, in which defendant had told the attorney that the doctor had given defendant securities approximating $30,000. It is claimed that this was proper rebuttal testimony and should not have been excluded. This tendered evidence of Mr. Lear was not express rebuttal in terms of the testimony of either Neighbor or Tannehill, because it did not relate to any specific conversation with the defendant to which they had testified. But in another sense it was proper rebuttal, for what it was worth, to repel the inference, to be derived from testimony on behalf of plaintiff, that the defendant had possession of the property without any claim thereto. The principle is stated as follows: "And in the case of an alleged gift *causa mortis*, a declaration of the donee, made while the donor is still

alive or on the day of the donor's death, as to the fact of the gift, is admissible both as a part of the *res gestæ* and to rebut the inference from other testimony that at a later day the donee made no mention of the gift." 12 R. C. L. 971, sec. 43. In the recent case of *Stevens v. People's Savings Bank*, 185 Ia. 619, a similar question was reviewed, and the judgment reversed because it was a law action tried, it is true, without the intervention of a jury, but with findings of the trial court based in part upon the absence of the excluded evidence. There the supreme court of Iowa held: "Evidence of declarations of claimant while in the possession of passbooks and before decedent's death that they belonged to her were admissible as in the nature of *res gestæ* to show the animus and intent attending possession, but not to prove the origin of her title." (171 N. W. 130.) In the present case the court first allowed an answer to be given but then struck it from the record, upon which, offers by the defendant were objected to and excluded on the grounds that the testimony was incompetent and improper rebuttal. We think the court should have allowed the attorney to testify that the defendant had informed him on that occasion that he claimed the property as a gift. This, however, is an equity case and is considered and reviewed *de novo*. We are not only authorized to consider evidence improperly excluded, where this clearly appears (4 C. J. 729, sec. 2653), and to give it that consideration to which it is entitled, but defendant, in his brief, suggests that such procedure be followed. We therefore shall consider this phase of the case as if the defendant's witness had testified that, on the occasion stated, the defendant told him that he claimed the property as a gift.

The main issue between the parties is whether the evidence is sufficient to sustain defendant's claim to a gift of the securities. It would unduly prolong this necessarily extended opinion to recite the testimony at great length. We can only abstract it and deduce our conclusions from it. While there is testimony here and there as to the

fact that the defendant got at different times and had at different times in his possession the different securities involved, yet the pivotal testimony must center about the last days of Dr. Tashjean, because it is then that the defendant alleges that the gift *causa mortis* was completed, when on May 26, 1928, the doctor, as defendant pleads, called defendant to his bedside and told defendant to keep the securities.

The plaintiff testified that all the personal property described in the petition was in his possession May 26, 1928, at 10 o'clock, but he was not allowed to testify as to the transaction or conversation or as to when or where the property came into his possession. George W. Woodward, proprietor of the Travelers hotel at Norfolk, from 1926 to 1928, where Dr. Tashjean lived at two different times in that period, testified for defendant that not long after the deceased came back from New York in March, 1928, the doctor made a trip to Sioux City, and on his return he handed some papers to defendant in the lobby of the hotel, told defendant they were defendant's and asked for a pen to "sign them over," but defendant said: "No; let that go for the time—just let that go." Witness supposes they were treasury certificates. (Witness was not a party to any conference but was about his duties.) He says the deceased and defendant counted the certificates out and he saw several that had $1,000 on them; that there were several of them and there was a mortgage of $6,000, but witness did not recall seeing any note. The doctor was stricken in front of the hotel on Friday, May 25, 1928, and witness helped him into the hotel, and later he was placed in bed and a trained nurse arrived about noon and cared for him until he died. About Saturday noon the patient indicated he wanted "Sam," and so the witness sent for "Tom," the defendant, to whom deceased had referred as "Sam," who came and remained about 30 minutes. There were no papers or money there. Deceased said, "Tom, I give everything to you to keep. Everything is yours," and "he motioned to his clothes and his money

—he had in his clothes \* \* \* but I had advised Tom to take the money out" the morning the doctor was taken sick. The securities in question were not there.

Mrs. Woodward, wife of the proprietor of the hotel, on behalf of defendant, testified on direct examination substantially as her husband did in respect of the securities and mortgage handed over by the doctor to the defendant on the doctor's return from Sioux City early in March, 1928. When the doctor asked for a pen to indorse the papers, she says: "Mr. Evans said not to be so hasty; just to wait awhile." She testified also to a transaction about April 4, 1928, between the doctor and the defendant when the former. gave the latter some papers, one probably a certificate of deposit and another probably a liberty bond, and said, "These are yours Tom," and he said, "No; I'll put them away for you." He said, "No, Tom; they're yours." "That's all I heard." On cross-examination she finally testified as to the papers turned over in March, 1928; that Mr. Evans said, "I won't take them now, Doc;" and as to the papers turned over about April 4, 1928, Mr. Evans said, "Well, doctor, I'll keep these for you. Q. I'll take care of them for you? A. Yes; or words to that effect."

Dorothy Woodward, the daughter of the proprietor, testified that she was present on the March, 1928, occasion; that she saw some papers, but did not know what they were, handed by the doctor to Mr. Evans, and "he told him he would keep them for him."

Dr. Nelson, whose specialty is treatment of the eye, ear, nose and throat, was first called about 10:30 the morning of May 25, 1928, when the doctor was stricken. A nurse was called while he was there. Witness afterwards called Dr. Barry, the general physician, to attend the case, but he himself dropped in three times a day. He saw him about 8:30 Saturday morning, when the patient stated that he was not going to get well. He saw him again about noon on Saturday and again about 3 o'clock on Saturday afternoon, and in his opinion the patient was con-

scious at both times. He had known him about eleven years. He had had a hemorrhage of the brain a few years before his death, and his final illness was caused by a like hemorrhage a little before noon May 25, 1928, causing incoherence of speech, dizziness, vomiting, and involuntary bowel movement. He also had bladder irritation and had to be catheterized. He doubtless had another hemorrhage, which later caused his death. Just before noon— probably between 11 and 12 o'clock—May 28, the patient would answer by shaking his head and nodding his head when a suggestion was made to him, but the witness does not recall anything that the patient said.

F. J. Tierney, janitor at the hotel, testified that he saw the doctor a few minutes after his stroke on the morning of May 25 and saw him several times a day thereafter until his death; that at no time did the doctor converse with any one, except when direct questions were asked him, and he would answer in the affirmative by using one grunt and in the negative by using two grunts.

C. C. Neighbor, a barber, who had known the doctor about seven years and had done barber work for him, had given him baths and had massaged him and assisted in giving him enemas, for several months prior to May, 1928, first saw the doctor about 2 o'clock the day he was stricken. The witness was there half or three-fourths of an hour at that time, and the doctor did not recognize him nor talk to him or any one else then, nor at any other time when he was present, though he was there often and stayed all night with the patient from 8 o'clock Saturday night until 10 o'clock Sunday forenoon. On the Monday after the doctor's death, says Neighbor, the defendant came to Neighbor's house and said, "I have close to $39,000 of Dr. Tashjean's money. I don't know what to do with it. I don't want those people to come back and just grab this money and get back to New York with it. I am going to see an attorney;" that they went to Mr. Lear's office and Evans introduced the witness, saying, "Mr. Neighbor also has a claim to file against the estate

for services;" that the attorney advised as to the procedure to probate a will and as to the filing of claims, and that nothing whatever was said about a gift; that at Neighbor's home on the same day the defendant said, "Where I made a damned fool of myself was where I didn't have doctor indorse the liberty bonds;" that on that occasion, as he left the witness, the defendant said, "I'm going to try to make a settlement with Mrs. Yardum for $20,000 and I'll split fifty-fifty with you;" that later, in June, in defendant's office, defendant asked Neighbor if he "would consider a proposition just to stay out of this altogether," and "I said, no; if it ever come to trial I would tell what happened; and he guaranteed me he wouldn't go to trial—he didn't want no publicity." It appeared from the cross-examination of this witness that he had filed a claim for $5,000 for personal services to the deceased in 1921, 1922, 1926, 1927, and 1928, and had never had a hearing on the claim, but that Mr. and Mrs. Yardum had told him shortly after the funeral that "they felt indebted to me $5,000 for the services I had rendered Dr. Tashjean."

The defendant testified in rebuttal that he never stated to Neighbor, in substance or in effect, that he had $39,000 of Dr. Tashjean's securities or money, that he was going to hold them and make the relatives give him $20,000 in settlement, and that he would give Neighbor half of it.

Dr. Barry, a physician and surgeon who had practiced in Norfolk and knew Dr. Tashjean since 1919, was called to attend the patient on May 25, 1928, and saw him first about noon; the patient was "muttering considerably, not an audible, understandable speech," and the doctor did not understand his responses to any questions; saw him about noon the next day and again in the evening; he had by noon developed a decided paralysis of his right arm and leg, and it was the doctor's impression that he was not conscious; his condition was the same in the evening and when the doctor saw him again Sunday noon when he died; that from the time of his first call to the

time of death the witness said the patient did not say anything the witness could understand, and the witness is of the opinion the patient was not of sound mind at noon of May 26, 1928, that he was not capable of knowing or realizing the nature and extent of his property or the disposition he might want to make of it.

Cleo Boltz, a trained nurse, cared for the patient from the time she was called, between 12 and 1 o'clock Friday, May 25, until his death, which she fixes at about 1:20 p. m. May 27. When she first arrived, she testifies, he was dressed and in a lying position in his bed in the Travelers hotel. She undressed him and cared for him continuously; he did not at any time talk so she could understand him, but Mr. Woodward thought, upon asking the patient if he wanted "Sam," that he wanted the defendant, and so the defendant was sent for. This was about noon on Saturday. About ten minutes after Mr. Evans came in, the nurse and Mr. Woodward left the room and took lunch together, and Mr. Evans stayed in the room with the patient while she went to lunch.

Dr. G. Alexander Young, of Omaha, an expert in nervous and mental diseases, in answer to a hypothetical question put to him on the stand, was of the opinion that Dr. Tashjean was of unsound mind from the time of his being taken suddenly ill to the time of his death, and that he was incapable of carrying on intelligently any business transactions.

Dr. J. M. Mayhew, of Lincoln, specialist in diagnosis, in internal medicine, and of mental diseases, likewise was of the opinion that Dr. Tashjean was of unsound mind from the time he had the cerebral hemorrhage on Friday; but on cross-examination, in answer to a hypothetical question, indicating that on Friday and Saturday the patient recognized and conversed with people, and that he had a second hemorrhage on Saturday evening or Sunday morning, which caused his death, stated that those facts would change his opinion as to the doctor's mental condition on Saturday noon. But assuming, after the first

stroke on Friday, the doctor did not talk but muttered, he expressed the opinion there was a hemorrhage in the first instance, and that he was not of sound mind on Saturday, the 26th of May.

It should be said, also, that there was testimony on behalf of defendant by the Woodwards and by Mrs. Hall to the effect that, after Dr. Tashjean's return from New York about the first of March, 1928, he had on different occasions expressed himself as not intending to give to the Yardums any more property than he had already given them, that he intended to leave the rest to his friends, meaning friends at Norfolk, where he had lived so long; and that he had expressed appreciation of the kindness of the defendant and wife toward him.

It is perfectly clear from the evidence that, on Saturday, the 26th day of May, 1928, when the defendant alleges in his pleading that the gift *causa mortis* was "fully completed," the defendant had possession of the securities involved and that such possession continued until after the death of Dr. Tashjean. The pivotal issue of fact is whether Dr. Tashjean by word or act then turned over to him the right to possess them as his own, so that after the death of the doctor the defendant had not only their possession but had the title as well. More accurately speaking, if the gift was a good gift *causa mortis,* the defendant took title as of the moment of the gift, subject to defeasance while the donor lived. 28 C. J. 697, sec. 118.

"To make a gift *causa mortis*, there must be clearly and intelligently manifested an intention to make a present gift to another." 12 R. C. L. 957, sec. 33; 28 C. J. 687, sec. 99; and cases cited. A gift *causa mortis* partakes of the nature of a legacy. "In its essential properties, it is testamentary." 28 C. J. 684, sec. 92. To make a gift *causa mortis* effective after the death of the alleged donor, it must appear that the donor was competent to make the gift, that he intended to make it, and that he clearly and intelligently manifested that intention.

Weighed by these rules, we do not find much difficulty in deciding the facts. It seems to us no unprejudiced and disinterested person can peruse the evidence shown in the bill of exceptions without coming to the conclusion that it fails to show clearly an intent on the part of Dr. Tashjean to express a gift of the personal property to the defendant at the time stated. In our opinion the evidence shows that from the time he was stricken on May 25 until he died on May 27, 1928, the deceased was not competent to make the gift, however much he might have desired it had he then been in the possession of sufficient mental faculties, and however worthy the defendant may have been of such a gift. If it could be said or thought that the evidence shows a decided or irreconcilable conflict and that in this court we should arrive at an independent conclusion without reference to the findings of the district court, we may consider the fact that the trial court observed the witnesses and their manner of testifying. *Johnson v. Erickson*, 110 Neb. 511; *Greusel v. Payne*, 107 Neb. 84; *Shafer v. Beatrice State Bank*, 99 Neb. 317; *Magill v. Magill*, 114 Neb. 636; *McDonald v. McDonald*, 115 Neb. 708.

For the reasons stated, we are of the opinion that the findings of the trial court were correct and that the decree was right. The judgment of the district court is therefore

AFFIRMED.