DOROTHY BATH, APPELLANT, V. HERMAN BATH, APPELLEE.

35 N. W. 2d 509

Filed January 10, 1949. No. 32456.

*Robert S. Finn* and *Dwight Griffiths,* for appellant.

*Armstrong & McKnight,* for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESS-MORE, YEAGER, CHAPPELL, and WENKE, JJ.

MESSMORE, J.

This is an action brought by Herman Bath to modify a decree of divorce obtained by his wife Dorothy Bath, to the extent of awarding him the custody of two minor sons, the issue of such marriage.

(591)

The parties were married in 1937 and immediately after their marriage established a home on a farm belonging to John Bath, the father of Herman Bath. On December 7, 1943, Dorothy Bath, plaintiff, obtained a decree of divorce from Herman Bath on the grounds of extreme cruelty. The defendant did not file an answer. At that time Richard William Bath was four years old and Dennis Eugene Bath was four months old. On December 4, 1943, by stipulation, Dorothy Bath was awarded the absolute custody of the two minor children. The defendant agreed to pay $30 per month for child support, with the right to visit the children. In the divorce decree the trial court ordered that the children should at all times be subject to the jurisdiction of the court, and that the plaintiff should keep the court advised of their whereabouts and not remove the children from the jurisdiction without first filing with the court a statement of her intention to so remove them. In January 1944, after the plaintiff had removed to Bakersfield, California, a notice was filed in the office of the clerk of the district court showing plaintiff's place of residence.

On January 9, 1948, the defendant filed an application to modify the decree of divorce, setting forth the terms of the decree and charging that the plaintiff had not provided a separate home for the children but that she and her children live with her mother; that since July 1947, he and his present wife have had the care, control, and custody of the minor children; and set forth certain facts upon which he contends there has been a change in conditions since the granting of the decree of divorce. The plaintiff, by answer and cross-petition, denied the allegations of the application and affirmatively alleged certain facts as to why the custody of the two children should not be granted to the defendant. The facts alleged in the pleadings to support the contentions of the respective parties will be covered in a résumé of the evidence.

On February 17, 1948, after trial, the district court

entered a decree awarding the custody of the older son, Richard, to the defendant, and the younger son, Dennis, to the plaintiff, requiring the defendant to thereafter pay $30 per month for the support of Dennis during his minority, and allowing an attorney's fee. Motions for new trial were filed by both plaintiff and defendant and were overruled. Thereupon the plaintiff gave notice of appeal and moved that a supersedeas bond be fixed. Certain procedure was then had which need not be detailed as to keeping the custody of the children in status quo until this appeal was finally determined. The defendant cross-appealed, contending that the court, in addition to having awarded him the custody of Richard, should have awarded him the custody of Dennis.

The principal and controlling assignment of error contended for by the plaintiff is that the decree of the trial court is not sustained by the evidence and is contrary to law.

For convenience the appellant and cross-appellee will retain title of plaintiff as originally designated, and the appellee and cross-appellant will retain the title of defendant as originally designated.

The defendant is engaged in farming 160 acres of land rented to him by his father who is a farmer living a mile and a quarter from the defendant, and a brother lives about the same distance from the defendant. Defendant has been engaged in farming this land for three or four years. He was married to his present wife July 28, 1946. The farm is well improved, with a six-room remodeled brick house, part of which is insulated, equipped with electricity and bath. The boys occupy an upstairs room that has been insulated for their use. At the time of the trial the boys had lived with their father and his present wife approximately seven months. Richard came to the defendant's home about the 6th of June, 1947, and Dennis was there at different times up to the first of August, 1947. Both have resided there

since that time. Mrs. Harriet Blythe, the maternal grandmother, brought the children from Morro Bay, California, to Kansas City, Missouri. She wrote the defendant and his wife to come there and pick up Richard, which they did. Upon delivery to his father, Richard was afflicted with a cold, and medicine was furnished to the father to be administered as required. The maternal grandmother remained in Kansas City, according to the defendant's evidence, to receive treatments for rheumatism. Prior to Thanksgiving the grandmother delivered the children's winter clothing to the father and returned to Kansas City where she remained until Christmas.

Richard started to school, entering the fourth grade. The school is about a mile and a quarter distant from the defendant's home. At times he rides a pony to school, sometimes a bicycle which was furnished by his relatives in California, and on cold days is taken to school in an automobile. His grades in school have improved since he started.

Shortly after Richard's arrival at the defendant's home he was taken to a physician and later to a specialist to determine whether or not he was afflicted with tuberculosis. The tests were negative.

Defendant testified that at the time of Richard's arrival he was nervous and in a run-down condition. A local physician diagnosed his difficulty as asthma, and applied tests relating it to house-dust which seemed to be the cause of his condition. He testified that Richard was a nervous child at the time he examined him, did not seem to be stabilized, but improved physically and seemed to be happy in his environment.

The defendant's present wife took the children with her on shopping trips, and provided special entertainment for them on occasions. The boys regularly attended Sunday school and church, and on occasions visited with numerous relatives of the defendant and his present wife in the immediate vicinity.

Defendant testified further that at the time of the divorce he was unable to provide a home for the children except his parent's home, and that his mother was aged and not able to take care of the children.

Exhibit No. 1 is a letter dated October 8, 1946, written by the plaintiff to the defendant, the substance of which is that upon her return from Morro Bay where she had seen the children she was quite disturbed in the change she found in Richard, that he "is getting entirely out of hand and doesn't seem to know what mind means, although a lot of the time he is as good as can be." Other parts of the letter are a request for the defendant to write to Richard, because since the defendant's remarriage Richard has felt that he has lost the love of his father, and that a letter to the effect that the father still loved him would aid the situation. The letter shows that she had expended some money for the children's clothes and had paid doctor bills in their behalf.

It appears that the defendant generally addressed his letters to Richard, and made no inquiry with reference to Dennis. He wrote not to exceed once every two months. Also, from the time the plaintiff moved to California in December 1943, until the two children returned to Nemaha County, Nebraska, in June 1947, the defendant had seen Dennis on one occasion in October 1944. At that time he visited the plaintiff and the children in California, arriving about ten o'clock on a Friday night and remaining until Monday morning. He was with the children except on Saturday night when he took the plaintiff to a show and a dance. On one other occasion, in the summer of 1945, he saw Richard when he returned with his maternal grandmother to Nebraska for a visit.

The defendant testified that Richard had been moved from one school to another in California and that the child had led an unsettled existence from the time the plaintiff moved to California. The plaintiff moved to California in December 1943, and within a month after

her arrival, moved to a home at 1812 Orange Street in Bakersfield, and continued to reside there until March 1947, or for approximately three years. Until she moved to that place she stayed with a Mrs. Higgins, a cousin of her mother's, at 800 Oleander Street. In March 1947 she vacated the Orange Street residence due to an increase in rent which she could not pay, and the children were taken to Mrs. Higgins' home at Morro Bay. The plaintiff, after disposing of her furniture and in about three weeks, moved to Morro Bay and lived with her children in the home of Mrs. Higgins. She was with the children continually until they returned to Nebraska in June 1947.

With reference to the change in schools, the record shows that Richard attended Lowell School in Bakersfield two years without interruption. The following year he started to school in Morro Bay. By November first it was apparent the apartment Mrs. Higgins was to provide for the plaintiff and her family would not be finished, so Richard returned to Bakersfield and enrolled in the same school he had attended. When the plaintiff moved to Morro Bay, Richard enrolled in school there for the rest of the school year.

Other witnesses testified that the defendant is a person of good habits and character, likewise his present wife; also as to Richard's regular attendance at school; that both children attended Sunday school and church; and that the children are provided with a good home. However these witnesses had not been in the home, or if so, had visited there infrequently.

The plaintiff testified that shortly after her divorce from the defendant she went to California with her mother and the two children and as to the different residences she occupied. She obtained employment as a meter reader for a gas and electric company. She usually got her own breakfast, ate where she could at noon, was home in the evening, and generally prepared the evening meal. She read to the children, played with

them, put them to bed, and provided for their welfare generally. During plaintiff's working hours her mother took care of the children, and there is no competent evidence that she is unable to assist the plaintiff in such respect at this time.

The plaintiff further testified that the defendant told her that he did not believe that Dennis was his child, and told her if she remarried that it would be necessary for her husband to adopt the children. He was not desirous of having Dennis visit him in the summertime together with Richard, as it would be too much of a burden on his present wife to take care of both of the children and do her work.

It appears by correspondence dated April 9, 1946, that the defendant spent about $1,300 in three months, or over $400 per month, and was worried about his finances. This money apparently was spent on parties that he had had on different occasions, the extent of which is not shown. He also admonished the plaintiff to not let the boys develop a temper like he had which he thought was caused by scoldings and nervousness. At another time the defendant requested the plaintiff to send him $40 to pay for a tonsillectomy for Richard when he was visiting in Nemaha County with his grandmother in the summer of 1945. She did not send the amount, so the operation was not performed. However, the plaintiff had the operation performed in 1946. Defendant made no contribution for the operation and did not make any contributions other than the $30 per month as required by the court in the divorce action.

Plaintiff testified that when she had possession of the children they attended church and Sunday school; that defendant requested Richard to come and visit him in Nebraska, but did not request that Dennis come. She informed him that she did not want the children separated and if one went on a visit the other should go also. She further testified that when she came to Nebraska and went in search of Richard, accompanied

by the sheriff, she was unable to find him at the defendant's home or his grandparent's home. She went to the schoolhouse, and at that time the defendant's brother was helping Richard over a barbed-wire fence, and he ran towards his uncle's home. She called to him and he acted as if he were afraid. She searched but was unable to find him. She further testified that the children were to stay with their father just for the summer; and the defendant testified that he and his wife were under the impression that the boys were there just for the summer.

The plaintiff further testified that during the last month the children were with her she quit her employment and spent the time with them, taking them on picnics, on walks, and occasionally to shows, and entertaining them generally. After the children left for Nebraska she moved different places, had different kinds of employment, and at the time of returning to Nebraska had employment in a nursing capacity at the Bakersfield hospital; that Richard was not unruly, he was like any other child who got out of hand occasionally. There is nothing in the record that discloses that he was unruly except as heretofore pointed out. An examination of the report cards appearing in the record shows Richard's regular attendance; that he is a conscientious, intelligent, well-behaved child; and that his grades are average or better and apparently as good in one school as in another.

Mrs. Higgins testified that she graduated from teacher's college in 1910 and went to California where she taught school; that she adopted three children and raised them, the youngest one being now 21 years old; that she engaged in the wholesale produce business after the death of her first husband and disposed of this business to her present husband and a son in 1931; that they have built a residence in Morro Bay recently and an upstairs apartment for the use of the plaintiff and her children, with a private entrance, the children

being privileged to at all times have the run of the entire house. The upstairs apartment is modern, newly and completely furnished, with a bath, kitchen and dining room, large closets, large living room and large bedroom. This witness helped raise the plaintiff and had custody of her for three years. She testified that the plaintiff is devoted to her children, to their health and to see that they have proper food; that they have well-balanced meals; that Dennis was always healthy and Richard had his tonsils out and had pneumonia once, which was about the extent of his illness, and that he did not have asthma.

Reference is made to correspondence by this witness with the defendant and his wife as to the adequacy of their home for Richard and her appraisal of the situation concerning the custody of the children. This correspondence is offered for impeachment and, at most, goes to her credibility as a witness, which has been considered by the court in such respect.

The foregoing is substantially the competent and relevant evidence shown by the record.

Section 42-312, R. S. 1943, with reference to changing the custody of children, provides as follows: "If the circumstances of the parties shall change, or it shall be to the best interests of the children, the court may afterwards from time to time on its own motion or on the petition of either parent revise or alter, to any extent, the decree so far as it concerns the care, custody and maintenance of the children or any of them."

It appears from the record that the plaintiff was entrusted with the care, control, and custody of these two minor children at the time she obtained her divorce. By doing a man's work which, when service men returned from the war, she was required to relinquish, and with the help of her mother and Mrs. Higgins, she provided for the comfort, health, and welfare of these two boys during trying years when they needed a

mother's care and when the defendant, by his own admission, was unable to provide a home.

Defendant's alleged change of conditions since the granting of the divorce are his reformation, his second marriage, and a remodeled home. True, defendant has a good home. The record discloses that the plaintiff has just as adequate a home, with the same amount of facilities and the same benefits for raising the children as the defendant.

Not until this trial did the defendant or his present wife express a desire to have the custody of the younger child, Dennis, now nearly five years of age. Defendant has not refuted the fact that he denied Dennis was his child. In writing to the children he wrote to Richard, the older child, upon the theory that he was older and could read. He ignored the existence of Dennis. This testimony shows a malignity of heart and a disregard for the future reputation and happiness of Dennis entirely inconsistent with the defendant's professed parental care. The trial court did not find the plaintiff to be an unfit and improper person to have the care, control, and custody of the younger child, and previously in the divorce action had found her to be a fit and proper person to have the control, care, and custody of both children.

Defendant offered certain letters in evidence, written by the maternal grandmother, constituting expressions of her opinion as to what would be for the best interests of at least the older child. These letters were properly not admitted in evidence and, at most, constituted the maternal grandmother's opinion, and were not binding on the plaintiff.

By agreement of the parties, the trial judge talked to Richard and reported that from this conversation Richard liked both of his parents, was happy with them both, and expressed a preference to be with his father. The child's statement may be considered, but is not controlling in determining his custody.

The rule to which this court is committed appears in Swolec v. Swolec, 122 Neb. 837, 241 N. W. 771, as follows: "In awarding the custody of minor children, the court looks only to the best interests of such children, and those of tender age are usually awarded to the mother."

And as stated in Feather v. Feather, 112 Neb. 315, 199 N. W. 533: "We think it is generally conceded that the best interests and welfare of a child of tender years will be best subserved by placing it in the custody of its natural mother, if she is a fit and proper person." See, also, Boxa v. Boxa, 92 Neb. 78, 137 N. W. 986; Downs v. Downs, 134 Neb. 457, 279 N. W. 151; Dier v. Dier, 141 Neb. 685, 4 N. W. 2d 731.

As stated in Gross v. Gross, 122 Neb. 25, 239 N. W. 201: "Custody of minor children awarded their mother in a divorce action will not be disturbed in a subsequent proceeding to modify the original decree, unless it is shown that the mother is an unfit person to have their custody, or that their best interests require such action."

From an examination of the record, we are convinced that for the best interests of these two minor children they should not be separated, and in this regard the following authorities are applicable.

In Poor v. Poor, 237 Mo. App. 744, 167 S. W. 2d 471, the custody of two boys aged six years and 11 months was involved. By stipulation of the parties, the same as in the instant case, the mother was given the custody of the children. Subsequently the father filed an application to have the custody awarded to him. He had remarried and there was evidence that tended to establish that the conditions of his home were congenial and happy, and that he was in a much better financial condition than at the time the divorce was granted. He contended the home conditions of the mother created an unfavorable environment for the children. The trial court divided the custody, awarding the older boy to the father and continued the custody of the younger boy

with the mother. The court, after an explanation as to the older boy needing the advice of the father and the father's attachment to the children, came to the conclusion that it would not be wise to sacrifice the interests of the children, and stated as follows: "It is always a tragedy in the life of a child when its parents are divorced. It is the children who suffer the bitter fruits of their folly. This has been the lot of * * * (the two little boys in question) and another tragedy should not be injected into their lives by separating them. * * * It is our conclusion that it is not to the best interest and welfare that these children be separated at this time; and that there is not sufficient change in the conditions of the parties, financially or otherwise, to warrant the court changing the original decree, * * *." See, also, Dunnigan v. Dunnigan, 182 Md. 47, 31 A. 2d 634; Tuter v. Tuter, (Mo. App.) 120 S. W. 2d 203; Fisher v. Fisher, (Mo. App.) 207 S. W. 261; Gibson v. Gibson, 156 Ark. 30, 245 S. W. 32; Ellis v. Johnson, 218 Mo. App. 272, 260 S. W. 1010; Bedal v. Bedal, (Mo. App.) 2 S. W. 2d 180.

In the light of the foregoing decisions it is clear that generally the love, solicitude, and devotion of a mother cannot be replaced by another, and is worth more to a child of tender years than all other things combined. A child should not be deprived of necessary and wholesome influences which spring from these characteristics of a mother if it can reasonably be avoided.

From an examination of the record and the authorities as herein cited, we conclude that the plaintiff should be, and is hereby, awarded the care, control, and custody of Richard William Bath and Dennis Eugene Bath, minor children of the plaintiff Dorothy Bath and the defendant Herman Bath, and that the defendant have the right to visit said children at reasonable and proper times as may be determined by the district court; it is further ordered that the defendant pay to the plaintiff the sum of $40 per month for the support and mainte-

nance of Richard William Bath and Dennis Eugene Bath until further order of the district court, and the sum of $200 as attorney's fees for services rendered in this court, in addition to the allowance for attorney's fees in the district court. The district court is hereby directed to enter judgment in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

PAINE, J., dissenting.

I think that the order of the district judge was right in giving nine-year-old Richard to his father, and should not be reversed by this court. He heard the testimony, found in the 400 pages of the bill of exceptions, as it was given in his court; he saw these witnesses on the witness stand, especially while they were undergoing cross-examination.

Again, one should not overlook the fact that the trial judge in the custody hearing was not a stranger to the parties, but was the same judge who had granted the divorce. At that trial no answer was filed by the defendant, but a stipulation and agreement, signed by both parties and their attorneys, was filed in court, in which the parties agreed that the plaintiff should have the sole and exclusive care, custody, and control of the two minor children; that the defendant should have the right to visit them; that defendant should pay $15 a month each, or a total of $30 a month, for the support of said children; and setting out that the parties had divided the personal property between them, which personal property has been accepted by the plaintiff in full of her claim for alimony against the defendant.

In strict accordance with the stipulation of the parties, the trial judge originally awarded the custody of both boys to the mother, who immediately took them to California, where they moved about from place to place. The evidence shows that Richard likes life on the farm, gathering eggs, turning stock into the pasture, and even on one occasion drove the tractor. He has a pony to ride to school and has improved in his school work. With the defendant and Ruth and his grandfather, John Bath, he

has attended Sunday school and church regularly. The same trial judge very properly under this evidence awarded the future custody of Richard to the father, with whom the judge said Richard told him he desired to stay.

The original decree of divorce was entered December 7, 1943, and stated that Richard was four years old and Dennis a few months old.

While the plaintiff appealed from the order entered February 17, 1948, changing the custody of Richard to his father, and put up a supersedeas bond of $500, yet, as she was planning an immediate return to California with the children, this court upon application and affidavits being filed entered a temporary order for the defendant father to retain the custody of Richard, even though supersedeas bond had been given. See 27 C. J. S., Divorce, § 324, p. 1258. The older boy, Richard, has now been continuously with defendant and his present wife, Ruth, since June 6, 1947.

Many witnesses were called to prove the good character of Herman and Ruth Bath, consisting of men of prominence and affairs, and close neighbors. All these witnesses vouched for the exemplary conduct of Herman Bath, who does not now use profanity, smoke, or drink; that he is a steady, hard worker and good farmer; and for the fine, high character of Ruth Bath. There can be no question but that the good character of Herman and Ruth Bath was proved beyond a doubt, and that they would give constant, daily, undivided attention to the care of Richard, whom they love and who not only loves them but is happier with them on the farm than he has ever been in his life.

In this record we find a letter written by plaintiff and another by the defendant which show certain facts. The defendant wrote plaintiff a letter, being exhibit No. 7, thanking her for pictures and records of school work, and said that her picture looked as though she had been working too hard. He then referred to some woman and

said that she had doubtless heard stories about "Cappy and I," but that the affair was not serious and he was not going steady with her. He urged plaintiff to be careful with the boys and not let them develop a temper like he had. He said that he had gone on several parties that had lasted several days, but he never got too drunk to know what he was doing. He said he had wasted the last two years, he had spent a lot of money, and it was all because he felt lost and terribly lonesome.

This letter, exhibit No. 7, bore the date April 9, 1946, which was only a few months prior to his marriage to Ruth. The defendant said that the date on this letter had been changed. Plaintiff did not produce the envelope showing the postmark, and while defendant admitted he wrote the letter he insisted it was written many months previous to its date. Because of the fact that the court reporter for some reason copied all of these many letters into his bill of exceptions instead of attaching the originals, it is impossible for the court to examine the original and see if the date appears to have been changed.

I will now set out some of the contents of letters written by the plaintiff. In exhibit No. 53 we have an envelope postmarked at Bakersfield, California, December 27, 1945, and addressed to "Mr. & Mrs. Don Coulter," R. R. 2, Auburn, Nebraska. The letter therein, being exhibit No. 52, was addressed "Dear Mabel," and parts of the letter read as follows:

"Larry's Aunt told me today that Larry is back in the states and will be here the first part of February. I haven't written him for about three or four months. I've been going with another fellow since last February. He's the one I want but think its hopeless. He's married and his wife refuses to divorce him so—He's the grandest fellow and is the one guy that is everything I've ever wanted. He's 37, but looks about 32, blond, a few inches taller than I am, and just swell. Also I forgot to add that he's got money. He's been separated for a year and a half. If I ever thought that she'd let him go I'd wait but

I have my doubts so I'll probably end up by breaking it up one of these days. I've always said that if I ever got married again it would be to someone older. So much for that. * * *.

"We had to work Mon. but we all got through about 11 o'clock and by the time we hit the office at 2 o'clock we were in the grove and on the beam. Of course the whole gang just had to go to one of the bars and have a few Tom & Jerrys. I had a swell glow when I got home but had to get rid of it as Mom and I took Dicky and Dennis down to Aunt Edith's for Christmas Eve. I went out Christmas Eve but took it easy as I had a headache from the afternoon and wanted to feel good Christmas Morning."

The defendant's exhibit No. 1 is a letter written by plaintiff under date of October 8, 1946, and addressed to "Dear Herman." It appears that the boys were living over at Morro Bay with Mrs. Higgins, for the plaintiff writes to defendant and says in exhibit No. 1: "I just got home from Morro Bay from seeing the kids. * * * I was quite disturbed over the change I found in Dicky. He is getting entirely out of hand and doesn't seem to know what mind means, although a lot of the time he is as good as can be. * * * I have been seriously considering marriage for several weeks * * *. The children both like Tommy a lot and he likes them, but his work in the oil field move him around so much."

An elderly lady, Mrs. Edith L. Higgins, of Morro Bay, California, came to Nebraska to testify as the plaintiff's only witness, aside from the clerk of the district court, called in her behalf as to the facts in the case, although plaintiff had lived in that part of Nebraska up to the time she moved to California.

When plaintiff, her mother, and the two boys went to California in December 1943, right after the divorce, they lived with Mrs. Higgins until they got a place on Orange Street, also in Bakersfield. Mrs. Higgins testified that her husband had built a house in Morro Bay, with an

apartment finished upstairs which plaintiff could use. However, this is about 150 miles from Bakersfield, where plaintiff last had employment in a hospital, but testified she did not know whether she still had the position.

One of the questions on the cross-examination of Mrs. Higgins, and the answer thereto, was as follows: "Q Well, I will ask you, Mrs. Higgins, if in September you didn't write to Mr. and Mrs. Herman Bath in regard to these children, and state: 'I am so thankful that he— meaning Dicky—can be rooted somewhere and have people care for him. Both he and Dennis have been such a part of my life and planning it tears at my heart strings to be separated from them.' And further stated that: 'Dicky has always loved the farm and had a deep feeling for his father and grandparents.' A I did."

Mrs. Higgins testified that while the children were near her she took them to Sunday school regularly, as she had a car. She testified that at the end of May 1947 she bought a round-trip ticket for the grandmother, Mrs. Blythe, to bring the children back to Nebraska, but only a one-way ticket for Dicky; that she bought them because she was an experienced traveler; and that Mrs. Blythe gave her the money for them.

During the trial of the case at bar, and when Ruth Bath, was concluding her testimony, plaintiff's attorney objected to the presence of Dicky Bath, who had just been brought into the courtroom. The attorney for the defendant said that he had had him brought into the courtroom to use as a witness for defendant. Plaintiff's attorney objected to the use of Dicky, a child of nine years, as a witness for the defendant, and argued that his father and present wife might have prejudiced the child's mind against his mother during the seven months he had lived with them. It was then agreed by counsel for both parties that the court should take Dicky into a separate room and talk with him, and a recess was taken and the judge took Dicky in another room and talked to him.

After the trial, and before the hearing on the motion

for new trial, the court made the following statement in the record: "That it was agreeable to both parties, and that the Court talked to the child, and that the Court reported back to respective counsel the gist of said conversation in which said child stated that he liked both parents and was happy with them both, but he expressed his preference to remain with his father."

In a recent case it was held in effect that, on petition to change custody of children of divorced parents, where evidence indicated that either mother's home or father's home would be proper for children, testimony, including that of children, that they preferred to continue to live with father and his present wife, whom they often referred to as "Mother," supported decree continuing custody with father. Grandell v. Short, 317 Mass. 605, 59 N. E. 2d 274.

In the above case the girls were only seven and eight years of age. The court also said generally that such findings of the court, based on oral testimony, both parents being present during the trial, are not to be set aside unless plainly wrong.

Many courts have held that evidence of the child's preference is admissible and such fact should be considered by the trial court, which is exactly what Judge Falloon did in the case at bar.

Child custody orders are necessarily subject to the control of the court in a divorce action, do not become final, and may be modified or changed from time to time as the best interest of the child may appear.

"The welfare of the child is the controlling consideration, and whenever it is shown that it is best for the welfare of the child that it be transferred from the custody to which it was awarded, the court will in its discretion modify the decree; otherwise modification is properly denied." 27 C. J. S., Divorce, § 317, p. 1189. See, also, Feather v. Feather, 112 Neb. 315, 199 N. W. 533; Carlson v. Carlson, 135 Neb. 569, 283 N. W. 214.

"This court is not bound by the strict rule of law which

binds the parties to an action; the state is a party here, in that its interest adheres to any action concerning the care and custody of an infant, when made the subject for judicial inquiry. The rights of parents, without exception in such cases, yields to the welfare of the infant. The matter rests rather upon sound judicial discretion than upon hard and fast rules of law. The judicial review upon appeal of judicial discretion of the nisi prius court is limited to judicial abuse of discretion." Weber v. Redding, 200 Ind. 448, 163 N. E. 269. See, also, Trevino v. Trevino, (Tex. Civ. App.) 193 S. W. 2d 254.

The Nebraska court has quoted an authority to the effect that " 'Every child born in the United States has, from the time it comes into existence, a birthright of citizenship which vests it with rights and privileges, entitling it to governmental protection, "and such government is obligated by its duty of protection, to consult the welfare, comfort, and interests of such child in regulating its custody during the period of its minority." Mercein v. People, 25 Wend. (N. Y.) 64, 35 Am. Dec. 653.' " State ex rel. Bize v. Young, 121 Neb. 619, 237 N. W. 677.

And again, our court has said in effect that the welfare of the child is the primary consideration to which all other questions must yield, and the court should consider, not only the spiritual and temporal welfare, but also the minor's further training in education and morals. See In re Guardianship of Herten, 127 Neb. 88, 254 N. W. 698.

There appears to be a belief held by some in Nebraska that if the custody of a child is given to the mother in the original divorce decree it cannot be taken from her unless and until she is shown to be an unfit person to have such custody. Such a statement appears in a per curiam opinion entered in Gross v. Gross, 122 Neb. 25, 239 N. W. 201.

The Gross case is cited in one other opinion, to wit, Downs v. Downs, 134 Neb. 457, 279 N. W. 151, which also appears to support the idea that only if the mother is proved unfit can the custody of her child, once given to

her, be changed. However, a careful reading of these two opinions shows the additional qualification, "or the best interests of the child require such action," as a modification of the other statement, which is therefore in accord with the Nebraska statute and the laws of many other states.

It is, therefore, my firm conviction that a district judge can and should change the custody of a child whenever it is for the best interests of such child, for our law which governs this matter says nothing about proving a mother unfit, but reads as follows: "If the circumstances of the parties shall change, or it shall be to the best interests of the children, the court may afterwards from time to time on its own motion or on the petition of either parent revise or alter, to any extent, the decree so far as it concerns the care, custody and maintenance of the children or any of them." § 42-312, R. S. 1943.

In this case the defendant has a cross-appeal asking that custody of Dennis also be awarded to him. The evidence as to this younger boy is as convincing as to the older boy. He loves the defendant and Ruth, for the evidence shows that when Dennis was at their farm home and when she was entertaining a club he would not eat until he could eat with her. In the months he lived in the farm home he developed in every way, and should in my opinion be there with his older brother; but it may be admitted that Dennis is of a tender, preschool age and the trial judge left his custody with his mother, which means, of course, his grandmother, Mrs. Blythe, and the cousin, Mrs. Higgins, as the mother is away working every day she can get employment and is out on dates many evenings.

"On appeal in an equity case, this court tries the case de novo; but where the witnesses appear in person before the district court and their testimony is conflicting, the conclusions reached by that court as to the credibility of the testimony are entitled to consideration." Enterprise Planing Mill Co. v. Methodist Episcopal Church, 100

Neb. 29, 158 N. W. 386. See, also, Shafer v. Beatrice State Bank, 99 Neb. 317, 156 N. W. 632; Greusel v. Payne, 107 Neb. 84, 185 N. W. 336; Jones v. Dooley, 107 Neb. 162, 185 N. W. 307; In re Estate of Waller, 116 Neb. 352, 217 N. W. 588; Yardum v. Evans, 120 Neb. 699, 235 N. W. 85; Southern Surety Co. v. Parmely, 121 Neb. 146, 236 N. W. 178; Cary v. Reiter, 122 Neb. 476, 240 N. W. 582; State v. Cheyenne County, 123 Neb. 1, 241 N. W. 747; Graham Ice Cream Co. v. Petros, 127 Neb. 172, 254 N. W. 869; Aeschleman v. Haschenburger Co., 127 Neb. 207, 254 N. W. 899.

"When the evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite." Green v. Green, 148 Neb. 19, 26 N. W. 2d 299. See, also, Maryland Casualty Co. v. Geary, 123 Neb. 851, 244 N. W. 797; Sutherland v. Sutherland, 132 Neb. 558, 272 N. W. 549; Watkins v. Waits, 148 Neb. 543, 28 N. W. 2d 206; Probert v. Grint, 148 Neb. 666, 28 N. W. 2d 548; Meredith v. Meredith, 148 Neb. 845, 29 N. W. 2d 643; Sell v. Sell, 148 Neb. 859, 29 N. W. 2d 877; Sporcic v. Swift & Co., 149 Neb. 246, 30 N. W. 2d 891.

"A reviewing court would accept the findings of a chancellor upon questions of fact, based on statements of witnesses whom he saw and heard testify, unless such findings were clearly and palpably erroneous." Kent v. Kent, 315 Ill. App. 284, 42 N. E. 2d 958.

"We believe that the present manifestation of interest in this boy on the part of his father should be encouraged and not discouraged. We prefer to determine this father's right to the custody of his son by his present conduct and not by his past conduct. We decline to say the father of this boy has been guilty of lack of interest or of conduct so unbecoming of a father as to forfeit his right to his son's custody." Kent v. Kent, *supra*.

"The modification must be based upon some change in

circumstances, or on the wishes (which are not controlling) of the children, and always for their good, for that is the sole guide in all changes of custodianship. Broadly stated the controlling considerations are a change of circumstances, the conduct of the custodial party, the morals of the parents, their financial condition, the age of the children and the devotion of either parent to the best interests of the children." Keezer, Marriage and Divorce (3d ed.), § 725, p. 764.

In a recent case of Madgett v. Madgett, 149 Neb. 41, 29 N. W. 2d 875, a default decree of divorce was entered July 20, 1945, which incorporated a property settlement. Thereafter, on an amended petition to modify the original decree of divorce as to the care, custody, and maintenance of the children, the trial court entered an amended decree April 9, 1947, from which decree the divorced wife appealed. The sons were ten and five years old. The father had a responsible position in an insurance company at a good salary. His mother had agreed to come and live with him and maintain his home. The children's mother remarried and moved to Denver, and the opinion says that the record reflects that she had failed to show the intelligent and proper regard that a mother should have for her sons. It was held that the amended decree was equitable and should be affirmed. This change of the custody of the two young boys from their mother to their father, who now has a good home for them, was based on the section of the statute heretofore set out, section 42-312, R. S. 1943, and says the controlling question is what is for the best interests of these two boys. The change in custody entered by the trial court was affirmed.

In the case at bar, the testimony of the defendant was supported by that of his excellent wife and many neighbors and friends while the plaintiff's evidence was supported by but one witness, her elderly cousin, Mrs. Higgins, who had come from California.

In appeals in actions in equity this court is required

to try the issues de novo, without reference to the findings of the trial court. However, in a vast number of opinions of our court it has been said in many ways that this court should consider the fact that the trial judge observed the witnesses, and in the case at bar both the plaintiff and the defendant appeared personally before him. He also examined this nine-year-old son, Richard, and decided that it was for his best interest that his custody be given to his father and his present wife, Ruth, and that he be given a permanent home on their farm.

The trial judge found that the circumstances of the defendant had greatly changed since the divorce was granted. Instead of living with his parents, his mother being sickly, defendant now had a modern six-room farm home. He has a fine young wife, to look after the spiritual and temporal welfare of Richard, and she will be able to devote much time to his further training, education, and morals.

In the case at bar, the district judge had a stipulation before him in the trial of the divorce case that the mother should be given the custody of these boys, but such an agreement is not controlling, and in later proceedings for the change of custody the future welfare of the child is the primary consideration, to which all other questions must yield.

In my opinion the order of the trial court was right and should be affirmed.

SIMMONS, C. J., dissenting.
I would affirm the judgment of the district court.

CHAPPELL, J., dissenting.
I respectfully dissent. As I view the record, the circumstances of the plaintiff, the defendant, and the boy Richard have all changed, and it would be for the best interests of Richard to be placed in his father's custody. That conclusion section 42-312, R. S. 1943, specifically permits.

Almost immediately after plaintiff was awarded the

divorce, she removed the children to California, in violation of the very decree upon which she now relies. There she moved them from pillar to post, and placed them in the care and supervision of others than herself, until in her custody Richard became uncontrollable, ill, nervous, and insecure, longing always for his father and the farm. In that situation, ultimately with no place to live, and her mother too ill to look after them, it is apparent that plaintiff sent the boys to their father in Nebraska, never intending that Richard should return. As I view it, the plaintiff is incompatible with and temperamentally unfit to have his custody.

Since the divorce, the father has married a lovely woman, whose character has never been the subject of attack. The father is now a substantial farmer with an excellent, stable home, wherein Richard has completely changed in character to become well, strong, cooperative, obedient, and happy. In other words, in that home of love, devotion, stability, and security, wherein he longs to live, Richard has found himself.

The future of a ten-year old boy is judicially at stake. His wish, expressed in anguish upon many occasions, has been judicially thwarted and denied. In State ex rel. Bize v. Young, 121 Neb. 619, 237 N. W. 677, this court held: "In awarding the custody of a minor child of over nine years of age, and of apparent intelligence and discretion, the express wishes of the child will usually be accorded great weight."

I believe that the judgment of the trial court should be affirmed.