MARY SHEFFNER DOUGLAS,

*Appellant,*

(Defendant below)

vs.

CAMDEN W. SHEFFNER, SR.,

*Appellee,*

(Plaintiff below)

(No. 2837; November 18th, 1958; 331 Pac. (2d) 840)

For the appellant the cause was submitted upon the brief and also oral argument of Charles L. Bates of Rawlins, Wyoming.

For the appellee the cause was submitted upon the brief and also oral argument of Frank R. Schofield of Green River, Wyoming.

Heard before Blume, C. J., and Harnsberger and Parker, JJ.

## OPINION

Mr. Chief Justice BLUME delivered the opinion of the court.

This is a proceeding commenced by Camden W. Sheffner, Sr., the plaintiff, to modify a decree of divorce granting custody of a minor child of seven years of age to the mother, Mary Sheffner Douglas. The court modified the decree, granting custody to the father and taking it away from the mother. From that decree Mrs. Douglas, the mother, has appealed to this court.

The parties were married in 1949 and had one child in question here by the name of Yvonne. Mrs. Douglas had been married previously and had three children, Geraldine, Jeanine and Clarice Ann. It does not clearly appear in the record but apparently their father was a man by the name of Watson. The decree of divorce between the parties herein was entered on March 17, 1953. In 1954 appellant married Doisey H. Douglas and by him had a daughter who apparently was born sometime in 1956. She was divorced from Douglas in April 1957 and at the time of the proceedings involved herein she was unmarried. The appellant herein lived at Green River, Wyoming, during 1953 and 1954 and apparently part of 1955. In 1955 or the early part of 1956 she moved to Rawlins, Wyoming, where she was employed by the Union Pacific Railroad.

The petition for modification of the decree of divorce was filed on June 20, 1957, alleging Mrs. Douglas was not a proper party to have the care and custody of the child Yvonne and alleging various matters of misconduct and threats to remove the child from the jurisdiction of the court. On the same day was filed a motion for immediate transfer of custody from the mother to the father. On that day, namely, June 20, 1957, the court entered an order ex parte transferring the custody of the child from the mother to the father, and an officer of the court caused the transfer to be made so that the child lived with her father from that time until the decree in the present proceedings. On October 9, 1957, Mrs. Douglas filed an answer in the case denying all misconduct and inability to properly take care of the child. The case was heard before the court and a decree was entered by it on November 5, 1957, modifying the divorce decree by transferring the custody to the father and relieving him from liability of paying alimony of $50 a month which had been provided in the divorce decree on March 17, 1953. It is from that decree an appeal has been taken herein.

The salient facts in this case are substantially as follows: The oldest girl, Geraldine, married when she was 16 years of age in 1954, apparently with the consent of her father. She is now in Guam. The second oldest girl, Jeanine, was committed to the girls' school at Sheridan, Wyoming, when she was 14 in 1954. This was done apparently with the consent of the Welfare Department of Sweetwater County, Wyoming. The girl is still at the Sheridan school. Mrs. Eaman, County Welfare Director of Sweetwater County, testified in the case and stated that Mrs. Douglas consulted her at various times in connection with the upbringing of her children. In May 1953 Geraldine came to her and complained that she had been beaten by her mother,

and the witness saw marks on her body. At another time the witness talked with Jeanine, who was then at the home of the witness. The girl at that time had welts across her back and buttocks. The witness knew nothing about the children after 1955.

Mrs. Wocniak, a neighbor of Mrs. Douglas, testified that the girls frequently came to her home in the evenings; that she thought by the way they ate that they were not nourished properly; further, that they were afraid to go home for fear they would wake their mother; and, that at one time she saw Geraldine who had been punished too severely. The witness knew nothing about the children after 1953.

The witness, Mrs. Warn, testified that she saw bruises on the body of Geraldine at one time, and that the girls stayed with her for six weeks until school was out. This was apparently with the consent of the welfare department and also apparently with the consent of Mrs. Douglas. The witness further testified that she took care of the two oldest girls another time for a period of three weeks. In 1954 Jeanine and Clarice Ann stayed at her house. Jeanine showed evidences of having been punished too severely. The witness knew nothing about the children after 1954.

Appellee, the plaintiff, testified that the children frequently came to him in 1953 and 1954 complaining that they were alone and wanting clothing and food which he supplied; that at one time he went to the children's home and found Geraldine locked up in her room with a man; and that bottles of wine, whiskey and beer were thrown out of the back door.

Mrs. Douglas testified that she never left the children except for two weeks when she was married to

Douglas; that she left a Mrs. McGoo in charge of the children who, however, had been ordered to leave by the appellee herein. We do not find that testimony to be denied. The appellee testified that during the time that Mrs. Douglas was gone he visited the home of the children about every day.

There is very little testimony relating to Yvonne, the girl in question herein, concerning her condition in 1953 or 1954 or 1955. Mrs. Warn testified that the appellee was rooming at her place; that he would frequently bring Yvonne over to her house when Mrs. Douglas was working; and that at one time Yvonne had been put out of doors with a sunsuit on and was badly burned. The witness stated that she treated the burns. Mrs. Warn knew nothing about the treatment of the child after 1954.

As mentioned above, Mrs. Douglas went to Rawlins in 1955 or 1956. Mrs. Jane Cameron testified that she had known Mrs. Douglas for the past 20 months; that she had been in the latter's home mornings, afternoons and evenings; that she observed the treatment of the children by Mrs. Douglas; that Mrs. Douglas was a good housekeeper and kept everything in order; and that the children were beautifully dressed, their manners were good and they were clean. She further testified that she never saw Mrs. Douglas abuse Yvonne; that they were a happy family; that Mrs. Douglas was a superior mother; that she never drank, was not immoral and never frequented bars.

Mrs. Henmingsen testified that: She had known Mrs. Douglas for three years and had been in her house two or three times a month; she rented a place to Mrs. Douglas; she had seen the children in and out of the home every few days and she never saw the

children when they weren't immaculately clean; Yvonne always looked like she stepped out of a band box and was well mannered and immaculately clean; Mrs. Douglas kept the house spotless; she never drank and there never was any evidence of drinking around her apartment; the children had good manners; she never saw Mrs. Douglas lay a hand on the children; the children were never left alone; they played like ordinary children; they were attached to their mother; Mrs. Douglas had baby sitters for the children or left them with Mrs. Francis; the children had regular meals and were properly fed. The witness felt certain that Mrs. Douglas was a proper mother to take care of the children.

Mrs. Honey Benson testified that: She had known Mrs. Douglas for a year, visited her home during mornings, afternoons and evenings and observed the children in and out of the home; she never saw Mrs. Douglas mistreat the children; she never struck or abused them although she made them mind; the children were clean and polite; Mrs. Douglas was a good housekeeper; the children were well fed and had warm meals; the children were happy and satisfied; Mrs. Douglas was a devoted mother; she never drank; Yvonne was always sweetly dressed; and the witness felt satisfied that Mrs. Douglas was a proper person to have the custody of the children.

Mr. Douglas testified in the case, stating that Mrs. Douglas was a proper person to have the custody of her children, but we shall not enter into the details of his testimony in view of the fact that most of it is disputed by the appellee herein.

The appellant in this case testified that she loves Yvonne; that she earns $400 a month; that she did not

threaten to take the child out of the jurisdiction of the court and could not afford to leave the state because of the amount of her earnings. She testified that she did not leave the child alone but had a baby sitter when she left the house; that she does not drink and in general takes proper care of Yvonne.

At the end of the taking of the testimony in the case, the court stated a desire to interview Yvonne privately and did so with the consent of counsel for both parties. It does not appear what Yvonne told him but it was presumably that she would be satisfied or would prefer to live with her father.

We considered the question of modification of a divorce decree in regard to the custody of a child in the case of Laughton v. Laughton, 71 Wyo. 506, 259 P.2d 1093, 1097, 43 A.L.R. 2d 351. It was said in that case:

"* * * that every presumption is in favor of the reasonableness of the original decree; that in the absence of a showing that a substantial change in circumstances has occurred subsequent to the entry of a decree awarding custody of children or that there has been some misconduct on the part of the parent having custody, the original award is final and cannot be modified, and that modification should be made only for the most cogent reasons, the welfare of the children being the paramount consideration."

We think that the appellee in this case has wholly failed to bear that burden of proof. Counsel for appellee thinks that the fact that one of the children married at the age of 16 and that another was sent to the girls' school at Sheridan shows that the appellant in this case was not a proper party to raise children; furthermore, that the same fact is shown by the punishment which was inflicted upon two of the girls while they lived in Green River. But of course the evidence in the case indicates that the two oldest girls

were somewhat unruly and they may have deserved the punishment which the mother inflicted upon them even though that punishment may have been somewhat too severe. All this evidence shows the anxiety of the mother to want to bring up her children in the proper way. No moral turpitude is imputed to her. The most that can be said is that while she was in Green River the burden of taking care of her four or five children was too much for her. There is no evidence in the case that the appellee could have done any better. In any event, we think that the situation in Green River is not at all controlling. Sorge v. Sorge, 112 Wash. 131, 191 P. 817. Counsel for appellee agrees that there is very little evidence that the appellant was an improper person to raise children while she was in Rawlins. The great weight of the evidence is to the contrary, as shown by the testimony of a number of disinterested witnesses in the case. As a matter of fact, the condition instead of being worse was considerably better while the appellant was living in Rawlins. Clarice Ann was in a school in Albuquerque, so the appellant had only two children under her care. There is nothing in the record that would warrant the court in holding that appellant is not the proper person to have the custody of these two minor children of tender and immature age.

Counsel for appellee, however, appears to lay great stress upon the fact that the trial judge interviewed Yvonne privately and, while the court made no report on what he found, counsel surmises that he must have found that Yvonne expressed a preference to live with her father. The surmise is probably well taken, and it is well established that the trial judge may interview a child to determine its preference as to living with either the mother or the father, provided that the child is of sufficient age to understand the effect

of the expression of such preference, though an expression of such preference is not conclusive. 39 Am. Jur. Parent and Child § 21; 27 C.J.S. Divorce § 317 b, p. 1191, nn. 54, 56; Ex parte Leu, 240 Mich. 240, 215 N.W. 384; Hurd on Habeas Corpus, 2d ed., pp. 531-540, where the subject is considered at length. In 39 Am.Jur., supra, at p. 610, it is said:

"Mental capacity is the criterion, rather than age, in determining whether substantial weight should be given to the desire of the child. This question is a preliminary one for the court. Until the infant arrives at the age of discretion, its wishes are neither considered nor consulted.* * *"

In Richards v. Collins, 45 N.J.Eq. 283, 17 A. 831, 832, 14 Am.St. Rep. 726, the court stated:

"* * * In resolving the general question of what will best subserve the interest and happiness of the child, its own wish and choice may be consulted and given weight, if it be of an age and capacity to form a rational judgment. There is no fixed age which capacitates such choice. It depends upon the extent of its mental development.* * *"

In Bath v. Bath, 150 Neb. 591, 35 N.W.2d 509, a boy of nine expressed his wishes in a private interview with the trial court. The court reported to counsel that the child expressed his preference to live with his father. The trial judge granted that wish. The supreme court reversed the decision because a child of that age should ordinarily live with his mother and because in that case the boy had a brother of the age of five and the court did not think it proper that the two boys should be separated. In the case of Sparks v. Sparks, 249 Ala. 352, 31 So.2d 313, the trial judge based a change of custody mainly on the wishes of a seven-year-old child but did not show a sufficient

change of conditions as to warrant a change of custody. The supreme court reversed the decision of the trial judge, holding that the question of change of conditions was the controlling factor. In the case of Commonwealth v. Taylor, 1841, 3 Metc., Mass., 72, 73, Chief Justice Shaw, considering a child of eight, stated as follows:

"* * * But in point of law, a child of such tender years has no will, no power of judging or electing; and therefore his will and choice are to be wholly disregarded. The natural and strong feelings of a child, which induce him to cling instinctively to those whom he has been accustomed to regard as his natural protectors, cannot be regarded as the exercise of a legal will, or of an intelligent choice.* * *"

The courts have not laid down any definite rule as to what should be done when the trial judge interviews a child. We think that if the child is interviewed the trial judge should state in his decision the preference expressed by the child, if any, and further state as to whether or not and to what extent the statements of the child have been taken into consideration in arriving at the decision. See Morris v. Morris, 121 Cal. App.2d 707, 264 P.2d 106, 107. It also might be well for judges to keep in mind that children of tender years are easily influenced and their statements should be received with caution.

Aside from the fact that a child of seven is hardly old enough to exercise the proper judgment, the preference expressed by her cannot be considered in the instant case for another reason. We have heretofore stated that the order changing custody of the child in the first place was made ex parte and that it was transferred to the father. It was, of course, wholly and entirely unfair to transfer the custody of the child

to the petitioner for a change of custody ex parte. The child remained in the custody of the father for a period of some four months. We have no doubt that during that time the father and his present wife did everything possible to ingratiate themselves with the child so as to induce her to tell the trial judge that she preferred to remain with her father. The child was so impressionable that one could expect nothing else under the circumstances. If it was necessary at all to make an ex parte order immediately taking the custody away from the mother, that custody should have been given to a third, disinterested, party and not to the petitioner for the change of custody. Courts have not frequently been called upon to determine that question, but we are not altogether without authority on that point. In the case of In re Poole, 2 MacArthur 583, 591, 9 D.C. 583, 591, 29 Am.Rep. 628, Mr. Justice Olin delivered the opinion of the court and stated as follows:

"I think that the order of the 13th of November, made on the back of the writ, which committed the custody of this boy Zaulo to the petitioner, Gatchel, before any return was made or permitted by the persons against whom the writ was issued, was erroneous and irregular. The infant should have remained in the custody of the marshal, or at least in the custody of some suitable person in no way connected with the controversy arising out of the writ, to be appointed by the court; or he might have been bailed for his appearance from day to day in court until the day of hearing."

We think that the evidence in this case requires us to apply the rule stated in 27 C.J.S. Divorce § 317 b, p. 1190, as follows: "The court will take a child of tender years away from the mother to whom it was awarded only for the most cogent reasons." In 19 C.J. 351 it is stated:

"* * * It is well settled, however, that courts will not deprive the mother of custody of her child unless it is shown clearly that she is so unfit a person as to endanger the child's welfare."

We do not think that any such showing has been made in this case.

The order of the trial court in this case is, accordingly, reversed with direction to cause the custody of the child here in question to be restored to the appellant herein and to restore the contribution which the appellee must make for the support of the child in the sum of $50 a month commencing at the time when the mandate in this case is sent down to the trial court.

Reversed with direction.