DUANE AESCHLEMAN ET AL., APPELLEES, V. HASCHEN-BURGER COMPANY, APPELLANT.

FILED MAY 22, 1934. No. 28977.

*Rosewater, Mecham, Burton, Hasselquist & Chew* and *Loren H. Laughlin,* for appellant.

*Reed, Ramacciotti & Robinson* and *Roman L. Hruska, contra.*

Heard before ROSE and PAINE, JJ., and LIGHTNER, REDICK and THOMSEN, District Judges.

THOMSEN, District Judge.

This is an action brought under the compensation law of the state of Nebraska to recover for the death of E. J. Aeschleman. The latter was employed as a traveling salesman for the Haschenburger Company, defendant.

At about 2 p. m. on February 23, 1932, Aeschleman was found beside his car on the road several miles from the town of Heartwell. Two men (later, witnesses) were traveling in a car westward on this road, when they noticed a two-seated Ford on the ridge off the right-hand side of the road. A ditch, about five feet below the surface of the road, separated the ridge from the road. The ditch was about half full of snow. The Ford was headed westward, straddling the ridge, and leaning sharply in the direction of the ditch. The car was a two-door one. The left door of the car was open, the door window was down, Aeschleman's body was lying on the snow almost at right-angle with the car, his head pointing toward the road, his arms extended; one foot was caught between the brake and clutch pedal, the other leg was doubled under him; a small metal tank, weighing about 35 to 40 pounds, was lying in the snow near the rear left wheel "but a little farther back;" a lever handle, part of the tank, was broken off and lying nearby. The snow did not indicate that the body had been dragged.

Later, an inspection of the car and the marks leading to it was made. The radius rod was found to be either broken or bent, and the right front wheel bent around to an angle of about 90 degrees. The front right fender had a nick on it and some cement paint, and part of its paint was scratched off. About 70 feet to the rear on the highway, a concrete post over a concrete culvert had a nick on it the height of the fender with some of the

paint of this car on the nick. Following the wheel marks leading from this cement post to the east were skid marks for about 30 "steps," indicating a motion backward and forward from the soft part of the road to the hard surface; shortly beyond the post to the west the wheel marks became indistinct, disappeared for six paces, but were picked up again near where the ditch began, and ran through the ditch up onto the ridge for about 40 feet to the car.

The day was clear and bright, but the road was slippery and soft along its sides, the hard gravel portion in the center, about eight feet wide, being described as "slick," "rough" and "wash-boardy." Some ice and snow had accumulated near the right-hand culvert and made a rise up to a level of the culvert apron, and the wheel marks indicated that the right wheels of the car had gone over this rise.

Some indication of the limit of a safe and cautious speed on that road that day is shown by the speed of the witnesses' car—30 to 35 miles an hour. All of the indications are that Aeschleman's car must have been going at a higher rate of speed. Aeschleman's car could not be pulled out by a wrecker; the road maintainer was required to remove it. Aeschleman's car passed about 70 feet beyond where it is evident it had struck the post, passed through the five-foot ditch and for 40 feet onto the ridge, coming to an abrupt stop with a broken or bent radius rod and twisted wheel. The front seats were thrown forward and the ignition was on. Great power was required to have driven the car to the position in which it ultimately rested, and it is reasonably certain that this power was accomplished by the momentum which the car had gained from previous speed. Where the wheel was so severely bent out of line or the radius rod was bent or broken is not known, but the evidence does not show in the wheel marks that any wheel was out of line. So it is reasonable to infer that the mechanical defects arose in the latter part of the trip, and that these

defects stopped the car's flight, and the indications are with reasonable certainty that the ride after the car struck the ditch was one of violence.

The witnesses picked Aeschleman up and carried him to a nearby town. He was breathing hard when picked up, was unconscious, never regained consciousness or said anything, and died within about 10 minutes from the time that he was taken into the car and before the witnesses reached a doctor's office. Both witnesses had been deputy state sheriffs, and one of them was then engaged in the prohibition service. Before Aeschleman died, this witness took the precaution to smell his breath and found no odor on it.

About five hours after Aeschleman's death Dr. Guildner made a casual examination of the body. Aeschleman never wore a hat. Dr. Guildner found a lump on the top of the head extending over a diameter of two and a half to three inches, in the midline from ear to ear. After the embalming, this lump practically disappeared, and this doctor, who was requested to make a post mortem by the compensation insurance carrier, regarded the lump of such slight significance then that he did not mention it in his report. The post mortem was conducted about 30 hours after Aeschleman's death and revealed macroscopically no physical imperfections of any kind. The stomach, heart and brain were removed and the stomach was immediately sent for a test for poisons to the University Hospital at Omaha. Dr. Guildner found no evidence of poisons, but he wanted to exclude every possibility. The brain was sectioned at the post mortem, but was not sent to the University Hospital until a month later. The heart accompanied the brain. These were preserved by being immersed in formalin, but the evidence does not show when the formalin was applied. However, the record does show that the body had been embalmed, but fails to show that the embalming fluid would not adequately preserve the brain substance so as to furnish satisfactory material for a microscopic examination. In the condition it ar-

rived, however, it was not satisfactory for gross examination.

Getting back to the scene of the accident, the inside of the car showed new tears and indented cuts on the upholstering and frame near the door at about the height of a man's head. There is no evidence that any of the windows were open except the one in the left door. The metal tank found at the car was a pressure sterilizer which at the request of his employer Aeschleman had picked up at a Hastings hospital. A metal stand or frame, about three feet high, a part of the sterilizer, was in the car leaning against the front seats. The sterilizer, about two feet long and one foot in diameter, was made of metal. It had a large dent in the center. Snow was on the ground in the ditch beside the left side of the car. There is no evidence that the sterilizer, which was cylindrical, had rolled. It is reasonably certain that there is no way the sterilizer could have left the car except through the driver's window; that it got out of the car before the car came to rest is clear from what is presented. The body of Aeschleman was not dragged, so it is reasonably certain that he fell or was thrown out of the car when the car stopped; that the sterilizer left the car while Aeschleman was still in it. There is no way that it could have left the car through the driver's window without coming in contact with Aeschleman. Its weight was 35 or 40 pounds. No matter what position the sterilizer had occupied in the car, when it was set in sufficient motion to leave the car, its momentum, as a scientific fact would be sufficient to deal a violent blow. The fact that the heavy metal handle of the sterilizer apparently had broken enroute is some indication of its force. The place where Aeschleman's bump occurred is about even with the cut upholstering on the car inside; it is also at a place where it is highly probable and almost certain the tank must have made its departure. We cannot conceive of another place available for its exit. If the tank hit his head a violent blow, it is apparent

that the force exerted could have been sufficient to have caused a fatal injury.

That Aeschleman was normal when his car first began to skid about on the road is indicated by the character of turns which the car made before it struck the post. It is reasonably certain that Aeschleman was skidding in the soft part of the road and that he was attempting to pull the car back and straighten its course on the hard side of the road; that by a narrow margin he succeeded in avoiding the post head-on; that his car was partially out of control during the various attempts at straightening it out. It is also reasonably certain that, if Aeschleman had been unconscious at that time and had had no control over the car, the pull on the right wheel made by the soft road would have been sufficient to have directed the car to the right without any return to the hard surface.

No one saw the accident, and after Aeschleman was taken to town it took about three-quarters of an hour before the witnesses returned to the scene of the accident to inspect the ground and car. The road was a main traveled highway. It had some traffic on it that day. It is reasonable to suppose that other traffic may have made marks on the road and in the soft portions, but the fact that the witnesses traced the skid marks directly up to the place where the paint was knocked off the concrete post, the fact that the material off the post was on the fender, and that material from the fender was on the post, and that the wheel marks after leaving the post were "picked up" with those appearing, after a lapse of six paces, indisputably connecting with the car, would indicate with reasonable certainty that the skid marks seen by the witnesses were those of Aeschleman's car.

That one may have but slight physical indication of a blow of such violence that it would cause death is shown by one of the defendant's witnesses, Dr. Duncan: "Q. You can have a blow on the head sufficient to kill without a fractured skull, can't you? A. Surely. Q. And you

can have a blow on the head sufficient to kill without external discoloration? A. Yes, sir. I think some of the most serious forms of head injury are those not associated with fracture. Q. And you can have a fatal blow on the head which does not produce readily apparent macroscopic evidence to any one but a skilled pathologist? A. Yes, sir." The fact that the bump on the head was reduced to an extent that it was not mentioned in the post mortem is accounted for by the fact that the embalming fluid reduces swellings of this character, and that the post mortem was not performed until about 30 hours after the man had died, and after he had been embalmed. The fact that no evidence of brain trauma was found macroscopically at the time of the post mortem is explained by reason of the fact that embalming fluid has some effect of leaching out some of the red corpuscles of a hemorrhage unless the area were large; but upon microscopic examination Dr. Eggers found in one section of the cortex evidence which he describes as "presumably of traumatic character," which was ante mortem. He explains this by saying: "The area involved in this change was about one-fourth of a square centimeter which is not a macroscopic lesion although it was only recognizable as a microscopic lesion, and I would confirm from the fact that I found this in two or three samples that it must have covered an appreciable amount of brain tissue." The changes which were post mortem were accurately determined by this witness, and his opinion is that what he found was ante mortem and due to injury.

The burden is upon the plaintiff to establish that the man came to his death by reason of accident. The presumption prevails that he died a natural death, but it prevails only so long as there is no evidence on the subject of how he came to his death. So it devolves upon the plaintiff to establish the fact that the deceased did not come to his death by reason of natural causes, and he met this burden by ruling out in his evidence and to some extent by cross-examination about every probable

cause of death known to science. An inspection of all the vital organs at the post mortem disclosed no infection; no evidence of plaques, emboli or infarcts was found. In other means of a probably natural death, defendant relies upon the stoppage of some minute artery which could only be discovered by months of microscopic work. Such evidence would have proved, probably to a certainty, the presence or absence of natural death. However, as hereinafter explained, under all the facts this was a higher burden than plaintiff was required to assume. However, it seems improbable that such cause could have existed, in that the evidence lacks any showing of infection to give rise to floating particles in the blood stream.

In assuming the foregoing burden, the plaintiff also took it upon himself to exclude any possibility of death by poisons. The stomach was sent to the Nebraska University and upon analysis by toxicologists they failed to find any evidence of 51 different kinds of poisons. This is a burden that the plaintiff need not have assumed. It was solely his duty to prove that the man came to his death by reason of accident. To do this it was necessary to produce evidence to overcome the presumption of natural death, and upon introduction of convincing evidence the presumption of natural death would disappear. Ordinarily, a presumption of this character has no weight as evidence. It is a mere legal excuse for not offering evidence. If met with evidence of probative force it ceases to be a factor in the case. *Stumpf v. Montgomery,* 101 Okla. 257, 32 A. L. R. 1490. It is not evidence but merely a rule concerning evidence. See *Alpine Forwarding Co. v. Pennsylvania R. Co.,* 60 Fed. (2d) 734; *McIver v. Schwartz,* 50 R. I. 68; *Smith v. Tompkins,* 52 R. I. 434; *Normandin v. Parenteau,* 150 Atl. (R. I.) 460; *Board of Water Commissioners v. Robbins,* 82 Conn. 623, 639; *Minutilla v. Providence Ice Cream Co.,* 50 R. I. 43; *Eggeling v. Chicago, R. I. & P. R. Co.,* 119 Neb. 229; *Commonwealth v. De Francesco,* 248 Mass. 9, 34 A. L. R. 937; *Rhodes v. Pennsylvania R. Co.,* 298 Pa. St. 101; 9 Ency.

of Evidence, 885; also end of annotation in 42 A. L. R. 872, and an interesting discussion of the subject in 46 Harvard Law Review (1932-1933) 1141. The prime, long-established exception to this very sound rule in this state is the presumption of innocence which does have the force and weight of evidence, following the same rule as in *Coffin v. United States,* 156 U. S. 432; *Garrison v. People,* 6 Neb. 274, 285.

If, then, thereafter the defendant could have shown any evidence of probative value that the man came to his death by reason of poisons, self-administered or otherwise, it may have been sufficient to have raised the question of such character of death and made it necessary for plaintiff to outweigh such proof by more convincing evidence of accidental death.

Here we have not the slightest evidence to warrant an inference of self-destruction. Aeschleman was a healthy, good-natured man, 31 years of age, married, and apparently happy in his family life. Dr. Guildner, a customer of Aeschleman, had seen him the night before and again four hours before his death, and testified the meetings had been pleasant; Aeschleman, on departing, saying he would see the doctor the next month. In the decided cases in which the burden to prove accidental death required the plaintiff to assume disproving suicide, evidence of suicide of convincing character had appeared. The presumption of natural death, then, had spent its force and the contest was to overcome the evidence of suicide in order to prove accidental death. *Grosvenor v. Fidelity & Casualty Co.,* 102 Neb. 629; *Dodder v. Aetna Life Ins. Co.,* 104 Neb. 70; *De Bruler v. City of Bayard,* 124 Neb. 566. No burden then rested on the plaintiff to establish that the deceased had not come to his death by reason of poisons intentionally or unintentionally administered, and it was unnecessary for plaintiff to have introduced evidence on the subject.

The medical evidence is sharply conflicting. On the side of the plaintiff is the testimony of Dr. Guildner, the

one who performed the post mortem, and Dr. Eggers, who examined the brain and heart 30 days after the post mortem. Dr. Guildner is a young doctor with about three years' experience. Dr. Eggers, on the other hand, is a man of wide experience. He has the chair of Pathology at the University of Nebraska Medical College, which position he has occupied since 1916. His specialty is pathology. For the defendant two experts appeared: Dr. George W. Covey, who has specialized in internal medicine, diagnosis and pathology, and was pathologist at Base Hospital No. 49 in France; and Dr. Duncan, who has practiced about 20 years, specialized in surgery, being professor of that subject at the Creighton University, and served as a surgeon in the army during the World War. The latter two testified from either hypothetical questions or answered the testimony they heard in the court-room. The evidence fails to show that either one of the latter ever examined the slides of the brain which Dr. Eggers produced in court. Of these witnesses, those for the plaintiff had the advantage of actual contact with the body, or parts of it. Dr. Guildner's opinion is that Aeschleman came to his death by reason of a blow on his head produced by the sterilizer. Dr. Eggers found a condition in part of the cortex of the brain which it was his opinion was ante mortem and due to injury, and although on cross-examination he said the condition he found might possibly be due to a number of causes, yet he insisted that he had his opinion as to what caused the condition. On practically every subject connected with the examination these witnesses disagreed. They disagreed as to the extent of the injury which a blow leaving visible marks of the character described could cause, as to what the visible effect of a fatal blow would be microscopically and otherwise, and as to the findings from Dr. Eggers' examination of the slides. From the reading of all this medical testimony alone it is clear that no finding could be made as a certainty as to the cause of Aeschleman's death.

We have considered the matter of the credibility of these various witnesses and have noted the fact that Dr. Guildner was the physician for some relatives of the deceased; that he knew the deceased well; that this doctor was a customer of the deceased; but merely because of this relationship it is not the province of the court entirely to disbelieve a witness whose testimony is probable. There is nothing in the record to indicate that he wilfully and intentionally testified falsely. We cannot, therefore, exclude the evidence of Dr. Guildner's finding a bump on the man's head, nor can we exclude his opinion as to the cause of the man's death, merely by reason of the foregoing facts. Dr. Guildner was in better position than any one else to know the man's condition, and, taken as a whole, the plaintiffs' experts coming into actual contact with the things about which they testify were in better position to know than the experts for the defendant, who base their opinions solely upon what was told to them or what they heard. Furthermore, as stated in *Conroy v. Garries*, 126 Neb. 730. "In this situation we think it proper to take into consideration the finding of the trial judge who saw the witnesses and heard them testify and was thus in better position to judge of their credibility than is this court. *In re Estate of Waller*, 116 Neb. 352; *Peterson v. Winkelmann*, 114 Neb. 714; *Jones v. Dooley*, 107 Neb. 162."

Coming now to some details mentioned by defendant: The defendant objected to certain testimony with respect to Dr. Guildner's examination of the slides prepared for pathologist Eggers, but the record shows that the slides were produced in court, and in view of the fact that the defendant apparently had ample opportunity to inspect these slides, we see no error in accepting the testimony of Dr. Guildner with respect to them. It was upon the slides, in conjunction with Dr. Guildner's own examination of the deceased, both before and at the post mortem, that he reached a conclusion that Aeschleman died of concussion of the brain.

The defendant objects to testimony in part based upon conversations with Dr. Eggers. But these conversations related merely to Dr. Eggers' conclusions as to what· the slides of different portions of the brain disclosed to him, and to the same facts Dr. Eggers testified while on the stand. An objection is also made that the slides were not prepared by Dr. Eggers, but testimony shows that they were prepared by an expert under the direction and supervision of Dr. Eggers and that the slides about which he testified were those so prepared. It is stated in defendant's brief that Dr. Guildner testified to a large number of slides, "probably ten," and that "these were not produced in court except the three testified to by Dr. Eggers," but we find Dr. Eggers testified with respect to three "brain *sections,*" and not to three slides only, and when asked whether the slides so prepared were in his possession, the record shows that he produced them. Nowhere does the record show how many slides Dr. Eggers produced in court, nor that all the slides to which Dr. Guildner testified had not been produced.

It is shown that the deceased was lying with his glasses "setting perfectly on his nose." The record fails to show what variety of glasses these were, whether they were the kind that fit onto the nose alone, or the variety that loop over the ears. In any event, the matter is not important. The position that Aeschleman occupied when found indicates, as certainly as can be shown by circumstantial evidence, that he either fell or was thrown out of the car, and if this violence was insufficient to dislodge his glasses, then certainly the fact that the glasses remained on his nose would not lead to an inference that he had not experienced violence while in the car.

The defendant says the record does not show how long Aeschleman had been lying in the position in which he was found. We see no importance to this detail, but since the road was a main traveled one, upon which at least two cars passed while the witnesses were there, one would naturally assume that cars passed regularly on the

highway, and although not a very weighty inference, yet it is likely that if other cars had passed before the witnesses' car arrived Aeschleman would probably have been seen before. It is unlikely that he would have remained there a long time without his having had some one see him in the position in which he was so clearly visible.

To reach a conclusion on this part of the case, taking into consideration the medical findings and all the physical facts, the speed at which Aeschleman's car must have gone, its tortuous course, the path it followed through the ditch and onto the ridge, the condition of the road, the clearly apparent violence with which the car was treated, the bump on Aeschleman's head, the practical impossibility of the cylindrical vessel leaving the car except through the window and at a height of Aeschleman's head, the position of the cylinder, its weight, the broken handle, the marks in the car, the position which Aeschleman occupied, would lead to an abiding conviction that Aeschleman received injuries from which he died; that his death was accidental; that his death is so established to a reasonable certainty. Ordinarily, varying facts and circumstances which produce proof that establishes a certainty, a reasonable certainty, a probability, or merely a possibility, make it practically impossible to assert definitely the classification into which facts fall, for surrounding each term is a twilight zone into which certainty merges into reasonable certainty, reasonable certainty into probability, and probability into mere possibility. Therefore, facts and circumstances in other decisions are of little benefit in reaching a conclusion of "reasonable certainty."

Coming now to another phase of the case: The appellant contends that Aeschleman was not an employee, but an independent contractor, and for that reason the appellant is not liable for compensation. Of course, if he were classed as an independent contractor, then no liability on the part of the appellant would exist; so it becomes necessary to summarize the evidence.

"Under cases heretofore decided there seems to be no single test as to what kind of an agreement will constitute one an employee within the workmen's compensation act. The measure or method of payment, who it is that selects the place and hours of labor, the particular plan of the work and liability for wrongful failure to properly perform it are often significant, though not necessarily controlling. Generally, the questions of whether or not the alleged employee, by the terms of the agreement, is understood to retain the right to direct the manner and method of the work as it proceeds, and what work shall be done and what not done, are important factors in determining whether or not the one doing the work is an employee." *Johnston v. Smith,* 123 Neb. 716.

Aeschleman was employed by the defendant company as a salesman of pharmaceutical and medical equipment. He was given a definite territory. He was required to make certain calls during each week, and for the most part required to be at the home office at each week-end, at which time he assisted in the work at the office, and at inventory time assisted in taking inventory; he was required to cover his entire territory in a given time and required to make daily reports and personal calls on customers. Among his other duties were to service machines and equipment in his territory and to make collections, not only on his own accounts but on others. The prices at which he sold goods were fixed, and any credit extended by him to customers had to be ratified or approved by the office. He began originally as a price clerk for the company, at which time he received a salary of $175 a month. At the time of his death he was working on a commission basis and receiving an advance of $50 a week, which is the amount he had been receiving for a long time, and although the president of the company at first testified that the matter of charging this advance to his account was merely a matter of computation to determine what net business Aeschleman was producing, yet later he stated that since Aeschleman's commissions

had fallen short by about $1,900 of the amount paid to him regularly, if Aeschleman had had an estate he would have filed a claim for it. The evidence further shows that during the time Aeschleman worked on inventory and in the office, and also on one occasion when he made a week's trip to Wisconsin at the request and in the interests of his employer in order to study service to be given to certain equipment made by a factory there, he was paid the same amount and these amounts were charged to his commission account. He was required to keep in constant touch with the office while out on the road, and occasionally the company would order him to go on emergency service calls. Out of the weekly payments he was required to pay his own expenses. The character of supervision exercised by his employer, the necessity for labor every day, the nature of his work, the service calls and collection duties are all important factors in making the relationship a closer one between Aeschleman and his employer than that mentioned in the cases of *Johnston v. Smith, supra,* and *Christensen v. Protector Sales Co.,* 105 Neb. 389, upon which cases the appellant relies, and bring Aeschleman within the classification of an employee. The fact that Aeschleman had his own car and paid his own expenses, under the conditions, is not so important. *Standish v. Larsen-Merryweather Co.,* 124 Neb. 197; *Showers v. Lund,* 123 Neb. 56; *Cole v. Minnick,* 123 Neb. 871.

We find no merit in the proposition suggested by appellant that the insurance carrier is not liable because the policy provides that it covers only "outside salesmen, collectors, and messengers who do not deliver merchandise," claiming that Aeschleman was delivering merchandise at the time of his death, having picked up the sterilizer at the Hastings hospital. We also note that Aeschleman occasionally delivered pharmaceutical materials out of his sample case, and that these were replaced by his employer. These acts of delivering were merely occasional and unimportant in considering all his work; and the

customary interpretation most favorable to the insured would offer no comfort to the appellant in these incidents. The court further notes that on a former occasion when Aeschleman had hurt himself in stepping into his car the insurance carrier had paid temporary disability; and that the insurance carrier has regularly received from the employer premiums to cover the compensation insurance of this particular employee. There seems some merit in the contention of appellee that these latter facts furnish additional grounds for fixing liability. *Venuto v. Carter Lake Club,* 104 Neb. 782; *Brown v. Bouschor,* 207 Mich. 594; *Kennedy v. Kennedy Mfg. & Engineering Co.,* 163 N. Y. Supp. 944.

The appellant complains that the court allowed interest at 7 per cent. on delinquent payments, the appellant classifying this interest as a penalty. The two cases cited in support of this proposition, *McCrary v. Wolff,* 109 Neb. 796, and *Osborn v. Omaha Structural Steel Co.,* 105 Neb. 216, relate to the 50 per cent. waiting time penalty. No cases are cited which assert that interest is classified as a penalty. Interest naturally follows the allowance of a claim of this character or any amount a court finds due.

The appellant shows that the widow remarried; and because of this fact contends that under the statute the compensation benefits become payable to the children, for the period since the widow's remarriage only; that these appellees, Duane and Charles, are not entitled to compensation for the entire period, and particularly not to the burial benefit. We find no merit in these contentions. Section 48-124, Comp. St. 1929, provides: "If the compensation payable under said sections to any person shall for any cause cease, the compensation to the remaining persons entitled thereunder shall thereafter be the same as would have been payable to them had they been the only persons entitled to compensation at the time of the death of the deceased." This section of the statute further provides that when the widow remarries the compensation benefits shall become payable to the children.

Section 48-122, Comp. St. 1929, provides for a burial allowance of $150 without deduction from other compensation. The appellant cites the fact the widow paid the burial expense and that it exceeded the $150 allowed by the court. No claim is made that appellant or the insurance carrier ever paid this sum to the widow or that they paid any compensation to the widow. Furthermore, the widow is a party to the suit and is not objecting. So, in view of the sections of the statute quoted, we see no inequity in allowing the total compensation and death benefit as allowed by the district court.

The fact that Aeschleman was paid $50 a week and that he paid his own expenses out of this sum is asserted not to be a foundation for determining what his weekly salary was, but we find no other satisfactory means of doing so. If he had been staying at home it would have been necessary for him to have supplied himself out of his salary with practically the same necessaries and comforts of life as on the road, and under the conditions it is immaterial what he may have spent out of the $50 a week for his own living. His income was practically fixed until such time as business improved and the commission from his sales would enable him to receive a larger amount, and in any event the $50 a week was more than doubly sufficient to have been the foundation for the compensation allowance of $15 a week.

We find no error in the district court's decree. It is in all respects affirmed, with the addition of an allowance of a reasonable attorney's fee to the appellees' attorneys for work in this court, which the court fixes at the sum of $200.

AFFIRMED.