JUDITH ANN MARASCO, APPELLEE, v. ROBERT W. FITZPATRICK, DOING BUSINESS AS FITZPATRICK ELECTRIC COMPANY, APPELLANT.

113 N. W. 2d 112

Filed February 2, 1962. No. 35134.

*Gaines, Spittler, Neely, Otis & Moore,* for appellant.

*Floersch & Floersch,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

SPENCER, J.

This is an appeal from an award in a workmen's compensation case. The principal question presented is whether the evidence in the record supports the finding of the district court that the death of plaintiff's decedent was caused by an electric shock or current accidentally received by said decedent in the course of his employment.

The facts are not in dispute. The only witnesses were those called by the plaintiff. There is, however, substantial disagreement as to the conclusions and inferences to be drawn from the facts. On appeal to this court in a workmen's compensation case, we consider the cause de novo upon the record before us. Knaggs v. City of Lexington, 171 Neb. 135, 105 N. W. 2d 727.

The plaintiff's decedent, John A. Marasco, Jr., is hereinafter referred to as decedent. He was a licensed electrician, 20 years of age, 6 feet tall, and weighed about 165 pounds. At the time of his death he was an employee of the defendant. On the morning of July 13, 1959, decedent and a helper, one Walter Washka, here-

inafter referred to as Washka, were installing a new electrical service and rewiring the basement at 2723 South Twenty-sixth Street in Omaha, Nebraska. At that time, the electricity, which was a 110-volt, 30-ampere service, was turned on in the house. Washka was working in the attic and decedent in the basement. Washka had been using a Thor electric drill which was in good operating condition. Decedent came to the attic for the drill, and apparently used it to drill three holes in the east concrete basement wall, near the northeast corner. Washka testified that the holes were not there when he took the drill to the attic, but were there when he found the body of decedent some 20 or more minutes after the decedent had obtained the drill from him.

Washka found the body of the decedent in the northeast corner of the basement. He was flat on his back, with his head to the north, approximately under the three holes in the northeast corner, and his feet were to the south. The upper part of his body was in a 2 or 3 foot space between the east wall and a table or work bench which was against the north wall and was loaded with miscellaneous tools and litter. His nose was bleeding, and Washka believed him to be unconscious. He was pronounced dead on arrival at the hospital to which he was taken by the rescue squad. There were blood spots on decedent's arm and nose, and blood on the floor under his head. There were also blood spots on the electric drill. Otherwise, there was no evidence of any cut, bruise, burn, or other indication of physical injury or damage of any kind.

At the time the body was found, the drill was lying on the floor 3 or more feet west of the legs, and south of the table, and was connected to an extension cord which was west of the drill. The drill had a ¾ inch bit attached, and, with the bit, was 22 inches long. The cord of the drill was 7½ feet long. The length of the extension cord to which the cord of the drill was attached is not shown, but from a photograph in evidence,

would be more than three times longer than the drill cord. The cord was disconnected from the electric socket which would be used for drilling. This socket was on a short drop cord 7½ to 8 feet southwest of the three holes previously referred to, and slightly above the level of the holes. Both the cord and the extension cord when found were "laid normally, all of it normally coiled up" on the floor.

After the body was removed, Washka put the drill in the work truck. He testified the truck was kept locked and that the drill was not touched from that time until he later gave it to a police officer. The police officer testified that later the same day he went to the defendant's place of business and picked up the drill from Washka. As he recalled it, the drill was in the back end of the service truck, which was open at that time. He then had the drill tested, and it was found to be inoperative because a brush plug assembly was missing. This assembly is a small threaded plug, called a plug adapter, screwed into an aperture at the back of the drill. It holds a spring attached to a piece of carbon which presses against the armature of the drill. This plug adapter is three-eighths of an inch high, and three-eighths of an inch across at the top. The top is covered by bakelite to the thickness of one-eighth of an inch. When this brush plug assembly is removed, the drill will not operate. The police searched the basement, the yard, and the truck, but did not find any part of the brush plug assembly. It is not known when or where or how it was lost or removed, but the fact that the evidence indicated the drill had been used to drill the three holes tended to establish that the plug was in place and the drill operative after the decedent took it to the basement.

Washka testified that the decedent was subject to nosebleeds, and he had them if he got up in a hot attic. He estimated the temperature that morning to be between 80 and 85 degrees. He also testified that when

the decedent came up to the attic for the drill, he said that he felt hot.

An autopsy was performed, and the pathologist testified that there were no anatomical findings which satisfactorily accounted for the death. He testified there were no burns any place on the body, but that burns are not always found in electrocution cases, and that outside of burns where 110 volts of electricity are involved, there are no characteristic signs for electrocution. The pathologist found the blood that was present came from a nosebleed, but did not know why the decedent had a nosebleed. The decedent had a deviated nasal septum, and people who have that defect are prone to have nosebleeds. The pathologist could find no evidence that the decedent had fallen. He would expect to find some mark if decedent fell on the concrete floor. He further testified that it was impossible to say that the decedent was electrocuted from the autopsy. That as far as the autopsy was concerned, he didn't know why decedent died.

The pathologist was asked a lengthy hypothetical question, which, among other things, asked the doctor to assume: "* * * that the floor of the basement where he was working was damp, * * * that if the drill were connected and the trigger depressed in lock position so that the drill was energized with electricity, a person handling the drill could get an electric shock if he stuck a metal object such as a screwdriver into the recess where the brush and the spring were missing, or if he touched the plug adapter when the bakelite was broken from the top of the adapter when the drill was energized with electricity; that he would receive a shock if he attempted to remove the plug adapter and the brush while the drill was energized with electricity; that when Mr. Marasco was found the electric cord was not attached to the electric socket but it could come out easily; the drill and the cord were approximately three feet from him and approximately under the elec-

tric outlet which was a cord hanging from the ceiling; * * *."

The law is well settled that the burden of proof is on the one asserting death due to other than natural causes to establish such fact by a preponderance of the evidence. Aeschleman v. Haschenburger Co., 127 Neb. 207, 254 N. W. 899. This does not mean, in a workmen's compensation case, that accidental death must be established to a certainty. The requirement is that it be established to a reasonable certainty. Porter v. Brinn-Jensen Co., 131 Neb. 611, 269 N. W. 96.

We said in Omaha & C. B. St. Ry. Co. v. Johnson, 109 Neb. 526, 191 N. W. 691: "In order that plaintiff recover under the workmen's compensation law for accidental death of an employee, the burden of proof is upon her to show with reasonable certainty that the death was proximately caused by the alleged injury."

Reasonable certainty is not so fixed a criterion that facts and circumstances in other decisions will be particularly helpful in any given case. There is, it is true, a twilight zone where reasonable certainty may be indistinguishable from reasonable probability, but we can say definitely that mere probability or possibility can never bridge that gap.

In a case in some ways analogous to the present situation, Mullen v. City of Hastings, 125 Neb. 172, 249 N. W. 560, we held: "When an employee dies suddenly and mysteriously while engaged in his work, the burden of proof that his death was an accident arising out of his employment rests upon the claimant for compensation, and such proof must amount to something more than mere guess."

Referring to the portion of the hypothetical question set out above, the law is well settled that a hypothetical question may be propounded to an expert if it is so framed as to fairly and reasonably reflect the facts proved by any of the witnesses in the case, provided the subject is one proper for expert testimony. Wessel

v. City of Lincoln, 145 Neb. 357, 16 N. W. 2d 476. In the instant case, keeping in mind that the expert testified that from the autopsy he performed he could not state why decedent died, does the hypothetical question propounded meet that test?

Without attempting to show all of the gaps between the evidence and the assumptions in the hypothetical question, we will consider the following: Plaintiff attempted to prove the basement floor was damp by two witnesses. Sergeant Bruning's testimony on this point is as follows: "Q. What was the condition of the floor? A. I would say it was normal; I wouldn't say it was wet, it was a dry floor. Q. Just the normal damp basement floor? A. The normal concrete floor."

The testimony of Washka, the other witness who testified on this point, was as follows: "Q. Now would you tell us what the condition of the basement floor was on that day when you found him? A. Well, the floor was just as dry and normal as any other basement, sir. Q. It's like any other basement? A. Well, any basement is a little damp. The floor was dry. Q. It was dry, would you say? A. As far as I know, it was dry. Q. It was a little damp; is that correct? A. All basements are damp."

As to the position of the cord when Washka found the body, his testimony is as follows: "Q. Now this cord then and the drill would have been lying to the west, is that correct, of his body? A. Yes, sir. Q. And how far west would you say this cord and drill were from his body? A. Well, that is a hard question to answer, sir. I figure it was laying in between the middle of that table. That would be about three or four feet from his legs. Q. Three or four feet from his legs? A. Yes, sir. Q. And you say it would be about in the middle of the table as shown? A. Well, that is just a guess. I was excited, I couldn't tell you no real definite measurements on it, sir." As to its position from the light socket, Washka's testimony is: "Q. And then

when you come down underneath the light, you said that the drill was about three or four feet away from the point underneath the light; is that correct? A. Yes. Q. And then the cord was a couple, three or four feet beyond that? A. Yes, sir." This testimony is supported by some marks on an exhibit in evidence, which places the position of the drill 3 or 4 feet west of the light socket 7½ to 8 feet southwest of the point where the drill was used.

As to the condition of the cord on the floor, Washka's testimony is as follows: "Q. And do you recall, Mr. Washka, how the extension cord was, how high it was or what the condition of it was? A. Well, to the best of my knowledge, it was laid normally, all of it normally coiled up. Q. It was coiled up? A. Yes, sir. Q. And was the plug of the drill plugged into the extension cord? A. Yes, sir. Q. And do you recall, Mr. Washka, whether or not the plug of the extension cord was plugged into the light socket? A. Well, no, sir, it wasn't." His testimony then continued: "Q. Now this drill, this Thor drill that you were using on that day, and which is represented by the pictures on Exhibits 4 and 5, was that the one that you normally used? A. Yes, sir. Q. And that you and John Marasco used regularly and was part of your tools, was it? A. Yes, sir. Q. Assigned to you? A. Yes, sir. Q. And had you ever in the use of this drill received any shock of any kind, electrical shock? A. No, sir. Q. Had you ever in the course of the use of this drill have it come disconnected from the socket? * * * A. They will fall out of the socket, old-fashioned socket, yes, sir."

It is evident in the portion of the hypothetical question set out above that the plaintiff is suggesting possibilities to account for an electric shock. However, the plaintiff's expert testified that it would be unusual for the adapter plug to come out accidentally, or for the bakelite insulation to break off, or for an electrician to be as careless as suggested by the plaintiff's assump-

tion. The testimony of James McGrane is as follows: "Q. Now then, it is not an ordinary thing for the plug to come out accidentally, is it? This is unusual? A. In a drill it is unusual, yes. Q. In a drill it is unusual. It is also unusual for the insulation to break off, isn't it? By unusual I mean this doesn't happen very frequently? A. No, not too often. Q. Bakelite is a hard material, it is actually bonded on the metal, isn't it? A. Yes. Q. In order to remove this plug you would use a screwdriver, would you not? A. Yes. Q. Now, an electrician, a person who is acquainted with electricity, would not ordinarily or usually remove that plug while the drill was energized, would he? A. I wouldn't think so, no. Q. Not if he knew anything about electricity? A. No. Q. You certainly wouldn't ordinarily or usually plug the drill in, pull the trigger, and then either remove the plug or hold onto a piece of metal and push it down inside that hole, would you? * * * A. No, I wouldn't think so. Q. * * * As far as that is concerned, an electrician's screwdriver is ordinarily an insulated screwdriver; that is, the handle is insulated? A. The handle, yes. Q. So the handle would act as an insulator between whatever the tip of the screwdriver touched and the man's hand? A. True. Q. That is the function of the insulation? A. Right."

There is no evidence in this record that the decedent even had a screwdriver with him in the basement. The testimony of Washka is that his personal tools were outside.

The evidence in this record is conclusive that the drill, except for the plug adapter assembly, as testified, was in good order with no cracks or breaks in the casing or no current leakage. The plaintiff's theory in effect requires a finding, without a scintilla of evidence, that the drill was connected and that the decedent, an electrician, did one or more acts which no reasonably prudent electrician would do while a drill was energized. Possibly more fatal to the plaintiff's contention than

this, however, is the physical unlikelihood that the drill and cord dropped from the socket and fell in a normally coiled up position more than 3 feet west of the socket. The evidence is that there was no mark on the drill of any nature other than the blood spots. If it were possible for the drill to fall in the position in which it was found, it would be logical to suppose that some mark would show on the drill. As suggested above, the drill was actually found a minimum of 10½ to 11 feet southwest of the point where the holes were actually drilled.

If we were to speculate, it might be much more logical to assume from the blood spots on the drill and its position, that the decedent had a nosebleed while drilling, disconnected the cord from the socket, and placed it on the floor. The testimony is undisputed that he had complained to Washka that he was hot when he went to the attic. Washka's testimony is that he frequently had nosebleeds when he worked while it was too hot. The absence of any marks on his body and the position in which it was found could reasonably suggest that he stretched out on the floor in the northeast corner, either to stop the nosebleed, or because he may have felt weak or faint from the heat.

Under our workmen's compensation law, plaintiff had the burden of establishing by a preponderance of the evidence a right to compensation. It cannot be left to surmise or conjecture, or based upon possibilities or probabilities, but must be established in a legal way and not by guess or speculation. Rose v. City of Fairmont, 140 Neb. 550, 300 N. W. 574.

It is clearly evident that the instant case does not meet the test of proof by reasonable certainty, or even reasonable probability. The most favorable light in which the record can be viewed is that there is at the very best a mere possibility that the decedent was electrocuted.

For the reasons given above, we find that the record and reasonable inferences arising therefrom do not sus-

tain the position that the death of plaintiff's decedent was caused by an electric shock or current accidentally received by the decedent in the course of his employment, nor does it point thereto with any reasonable certainty. The judgment is therefore reversed and the claim dismissed.

REVERSED AND DISMISSED.

SIMMONS, C. J., participating on briefs.