ELTON H. GIBSON, APPELLANT, V. CITY OF LINCOLN, DOING BUSINESS AS LINCOLN TRANSPORTATION SYSTEM, APPELLEE.
376 N.W.2d 785

Filed November 22, 1985.   No. 85-117.

Walter E. Zink II of Baylor, Evnen, Curtiss, Grimit & Witt, and Friedman Law Offices, for appellant.

James D. Faimon, Assistant Lincoln City Attorney, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

Elton H. Gibson appeals the dismissal of his petition on rehearing in the Nebraska Workmen's Compensation Court. We affirm.

During the year preceding the incident in question, Gibson, age 61, was employed as a Handi-van driver by the City of

Lincoln (Lincoln Transportation System). The Handi-van transports handicapped and elderly persons, and the van driver must assist patrons entering and leaving the van. Gibson was in good health at the time of the incident, had been smoking an average of one package of cigarettes daily, and, several years before the incident, had experienced chest pains while shoveling snow, an activity discontinued for some time past.

On February 15, 1983, while lifting a woman's wheelchair to a secure location within the Handi-van, Gibson experienced in his chest a "very sharp pain . . . about six inches below [the] neck." The combined weight of the wheelchair and woman was 200 pounds. Gibson's pain persisted throughout the remaining day. That afternoon, Gibson notified his supervisor of the chest pain, and on February 16 continued experiencing pain in his chest. On February 17 Gibson saw his physician, who ordered some tests, including an electrocardiogram (a graphic tracing of the electric current produced by contraction of the heart muscle) which recorded irregular function in Gibson's heart, prompting a suggested followup appointment which Gibson never scheduled.

During the evening of February 18, Gibson's chest pain recurred while he was attending a theater. En route to his home, Gibson stopped at Bryan Memorial Hospital for evaluation and was admitted to the hospital's coronary care unit after an electrocardiogram indicated irregularity in Gibson's heart. While confined in the coronary care unit at Bryan on February 19, Gibson suffered a heart attack. Gibson's physician, Dr. Paul W. Jewett, a cardiologist, made an initial diagnosis that Gibson suffered from angina pectoris (chest pain with a feeling of suffocation) and probably had been suffering from this condition for approximately 4 years. Later, Dr. Jewett obtained an arteriogram (a graphic tracing of the arterial pulse of the heart) of Gibson and concluded that Gibson had "three-vessel coronary artery obstructive disease" and also had "heart muscle damage." Subsequent diagnosis disclosed that obstruction of Gibson's coronary vessels was 100 percent in the right artery, 50 percent in the mid-left anterior descending artery, and 75 percent in the obtuse marginal artery. Gibson was dismissed from Bryan Memorial Hospital on March 3, and on March 17 Dr. Deepak M. Gangahar, a thoracic and

cardiovascular surgeon, performed coronary bypass surgery to repair Gibson's blocked blood vessels. In June 1983 Gibson unsuccessfully attempted to return to work, and has never been able to resume his duties as a Handi-van driver.

In the rehearing, the parties introduced medical evidence through depositions of doctors.

Gibson presented evidence from Dr. Jewett, who testified there are three classes of chest pain attributable to coronary blockage. One type of chest pain is angina, brief pain lasting perhaps 5 minutes. The second is a heart attack, pain lasting for hours at a time and associated with permanent heart muscle damage. Finally, interposed between angina and a heart attack is an "intermediate syndrome," pain lasting between 10 minutes and an hour but not associated with permanent damage—"a stunned heart, but not a permanently damaged heart." Intermediate syndrome is a warning of an impending heart attack. According to Dr. Jewett, Gibson's symptoms fit into the intermediate syndrome classification. Also, Dr. Jewett observed that Gibson had a "severe amount of coronary artery obstructive disease" but acknowledged that the wheelchair episode of February 15 "contributed in some material and substantial degree to cause [Gibson's heart attack]." Dr. Jewett expressed an opinion that Gibson is unable to return to work as a bus driver and is permanently and totally disabled as a result of the heart attack and recurrent symptoms which are precipitated by any sort of mild activity on his part. Dr. Jewett further testified that Gibson's

> exertion of lifting a wheelchair into position and locking it substantially increased the risk which had been created by his coronary artery disease and that this exertion precipitated or contributed in some material and substantial degree to cause the transmural myocardial infarction which he experienced. . . . [T]his exertion at work of lifting the wheelchair and locking it represented exertion greater than that of nonemployment life for Mr. Gibson or any other person.

Dr. Gangahar testified that he observed an atherosclerotic condition in Gibson and that Gibson had "critical blockage" of his coronary arteries which had been giving him chest pain or angina for the last 3 years or so prior to the surgery. The

objective of the surgical procedure performed by Dr. Gangahar was restoration of circulation "so the blood can go beyond the blockage, induced by cholesterol plaque . . . atherosclerotic plaqueing."

To counteract evidence from Dr. Jewett, the city had employed Dr. Ronald A. Draur, a cardiologist, who reviewed Dr. Jewett's deposition as well as medical and surgical reports compiled by Gibson's physicians, including the coronary arteriogram obtained by Dr. Jewett during Gibson's confinement in Bryan Memorial Hospital. After reviewing such medical data Dr. Draur formed an opinion that Gibson suffered from severe atherosclerotic coronary artery disease (blockage of the blood vessels of the heart) at the time of his heart attack and that such arterial blockage resulted in an insufficient blood supply to the interior wall of Gibson's heart, causing death of heart muscle cells—a condition medically known as a myocardial infarction and commonly called a heart attack. Dr. Draur did not dispute that Gibson was totally disabled from a heart attack. However, Dr. Draur expressed his opinion:

> The extent of risk imposed on Mr. Gibson by his heart disease . . . for the development of myocardial infarction can probably best be summarized by saying that the underlying substrate of coronary atherosclerosis is the cause of myocardial infarction, and that he was at risk for development of a heart attack . . . because of the presence of that disease . . . and that he was at risk for development of that in view of the extensive nature of the disease discovered at arteriography at any time. It could be at any time and it could be with or without any significant exertion.

For Dr. Draur the interval of 4 days between Gibson's angina and the heart attack was significant, because

> to consider that a specific activity caused a myocardial infarction, there should be a close temporal relationship between that physical activity and the onset of activity. When that close temporal relationship is lacking, then we speak of the precipitating episode, if you want to use that, or the event in question, as being angina rather than myocardial infarction. If there's no damage done at the

time of the exertion, then the exertion has caused angina. If there is damage that has occurred at the time of the myocardial infarction — I mean, if there's damage that occurs at the time of that physical exertion, then there is a myocardial infarction.

Introduced during and included as a part of Dr. Draur's deposition was a copy of that doctor's report in a letter dated October 3, 1984, sent to the city attorney, which was, in substance, a synopsis of the testimony contained in the Draur deposition. At trial Gibson objected to admission of the written report from Dr. Draur.

The three-judge panel of the Nebraska Workmen's Compensation Court found that Gibson was suffering from a severe atherosclerotic coronary artery disease and stated:

> The plaintiff's myocardial infarction on February 19, 1983, was not caused by his exertion 4 days previously. That exertion had only caused an episode of angina. In this connection, the Court has afforded greater weight to the testimony of Dr. Drauer [sic] rather than that of Dr. Jewett. This episode of angina did not disable the plaintiff, did not cause the plaintiff to incur the hospital and medical expenses which are before the Court, and is not the condition which has today rendered the plaintiff totally disabled. The petition of the plaintiff should be dismissed.

Gibson assigned four errors entering into dismissal of his petition: (1) Admitting the opinion testimony of an unqualified witness, Dr. Draur, whose opinion was based on hearsay, namely, the deposition of Dr. Jewett and medical records for Gibson; (2) Admission in evidence of a copy of Dr. Draur's report dated October 3, 1984; (3) The compensation court's giving Dr. Draur's testimony greater weight than the testimony of Dr. Jewett, an attending physician; and (4) The compensation court's failing to enter an award for Gibson.

Regarding Dr. Draur's opinion, Gibson contends that, because Dr. Draur never examined him, the physician was not qualified to testify as an expert witness on Gibson's condition and injury. However, Gibson did not raise any question concerning Dr. Draur's professional qualifications as an expert by reason of "scientific, technical, or other specialized

knowledge" and does not suggest that a medical opinion in the present case would not "assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." See Rule 702, Nebraska Evidence Rules (Neb. Rev. Stat. § 27-702 (Reissue 1979)). Dr. Draur was an expert whose opinion was admissible on the question whether Gibson's claimed injury was compensable under the Nebraska Workmen's Compensation Act. See Neb. Rev. Stat. § 48-151(4) (Reissue 1984) (definition of *injury* for purposes of the act). Continuing his contention about an expert's opinion, Gibson argues that Dr. Draur's opinion, based on medical data and Gibson's medical records obtained from third parties, is inadmissible due to involvement of hearsay.

Gibson overlooks Rule 703, Nebraska Evidence Rules:

> The facts or data in the particular case on which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Neb. Rev. Stat. § 27-703 (Reissue 1979).

Rule 703, Nebraska Evidence Rules, is patterned on Rule 703 of the Federal Rules of Evidence. The advisory committee's note for federal Rule 703 contains:

> In this respect the rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court. Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.

Although a doctor employed to testify in opposition to an employee's claim for workmen's compensation is not cast in the role of a physician making a "life-and-death" decision about a patient, nevertheless an underlying objective of the Nebraska Evidence Rules is inexpensive efficiency in presentation of relevant evidence. That objective compels admission of Dr. Draur's opinion. Further, as expressed in Rule 102, Nebraska Evidence Rules: "These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." Neb. Rev. Stat. § 27-102 (Reissue 1979).

Gibson does not argue that the facts or medical data used by Dr. Draur as the basis for his expert opinion were not the type reasonably relied upon by cardiologists in forming their professional opinions or inferences; for instance, Dr. Draur's reliance on the arteriogram used by Dr. Jewett in treating Gibson. Gibson's only complaint is directed to the nature of the data as hearsay. However, Rule 703, Nebraska Evidence Rules, clearly contemplates admission of an expert's opinion based on hearsay supplying facts or data for that opinion, rather than a requirement of firsthand knowledge as the only source of information for an expert's opinion. As a result of Rule 703, Nebraska Evidence Rules, Dr. Draur's opinion was properly admitted as evidence relative to Gibson's claim.

Dr. Draur's report contained in his letter to the city attorney was hearsay, see Rule 801, Nebraska Evidence Rules (Neb. Rev. Stat. § 27-801 (Reissue 1979)), and, therefore, not admissible, see Rule 802, Nebraska Evidence Rules (Neb. Rev. Stat. § 27-802 (Reissue 1979)). In a bench trial, that is, all factual determinations made by a judge and not by a jury, we apply the principle or "presumption" that the trial court will consider only relevant and otherwise admissible evidence so that an erroneous admission of evidence during a bench trial will not result in a reversal, if there is relevant and admissible evidence to sustain the trial court's judgment. See, *Barber v. Barber*, 207 Neb. 101, 296 N.W.2d 463 (1980); *State v. Tomes*, 218 Neb. 148, 352 N.W.2d 608 (1984). The foregoing principle, likewise, applies to a rehearing before the Nebraska Workmen's

Compensation Court. Moreover, Dr. Draur's letter to the city attorney provided nothing materially different from the evidence properly admitted through Dr. Draur's deposition. In view of Dr. Draur's testimony, we find that no substantial right of Gibson has been prejudicially affected as a consequence of the doctor's report incorrectly admitted as evidence. See Rule 103(1), Nebraska Evidence Rules (Neb. Rev. Stat. § 27-103(1) (Reissue 1979)).

Gibson next argues that the testimony from Dr. Draur, who had not examined him, should not be given greater weight than the testimony from Dr. Jewett, Gibson's attending physician. As a corollary complaint, Gibson advocates a rule that an attending or examining physician's testimony should automatically be accorded more weight than testimony from a physician who has neither attended nor personally examined the person about whom an opinion is to be expressed. To support his contention Gibson relies on *Aeschleman v. Haschenburger Co.*, 127 Neb. 207, 254 N.W. 899 (1934), where this court acknowledged that a physician, as a plaintiff's witness with firsthand knowledge derived from an autopsy performed by the witness, was in "better position to know than the experts [physicians] for the defendant, who base their opinions solely upon what was told to them or what they heard." *Id.* at 217, 254 N.W. at 904. We note that none of the physicians testifying in *Aeschleman* was an attending physician. The court in *Aeschleman* did not require, as a rule of law governing evidence, that testimony from a doctor with firsthand knowledge be accorded greater weight than testimony from physicians who had not attended or personally examined the person about whom expert opinion is expressed. Rather, in *Aeschleman*, this court recognized that personal observations by a physician may be a factor affecting weight of testimony or credibility of a witness expressing an expert opinion. If we were to follow the path pointed by Gibson and adopt a principle that an attending or examining physician is conclusively more credible, and testimony from such a witness has greater weight than testimony from a physician who has not attended or personally examined an individual, we would soon find ourselves in an evidentiary dead end where a court must ultimately direct a jury to make factual determinations solely

on the basis of a witness' firsthand knowledge, notwithstanding a jury's disbelieving the witness or reasonably concluding that testimony from such witness was to be given little or no weight.

In the absence of discredit as a matter of law, the "trier of fact" remains the sole judge of a witness' credibility and the testimony's weight. Generally, an expert witness' firsthand knowledge is a factor which may affect such witness' credibility and weight given to the testimony from that expert, but presence or absence of firsthand knowledge does not, by itself, necessarily establish preference or priority in evidentiary value. In Gibson's case, credibility of the physicians and weight of their testimony were questions of fact to be resolved by the compensation court.

As his final assignment of error, Gibson asserts that he is entitled to an award on account of his heart attack. Although the testifying physicians, generally, agreed that Gibson suffered a myocardial infarction, or heart attack, resulting in permanent disability, the medical evidence is in conflict concerning the cause of Gibson's heart attack. Dr. Gangahar described Gibson's chronic arterial condition antedating myocardial infarction for as much as "three years or so." Dr. Jewett testified that Gibson's heart attack was work related, that is, caused by employment exertion greater than exertion during Gibson's "nonemployment life." Dr. Draur countered that, although Gibson's angina was work related, the heart attack, with consequential medical expenses and disability, was not caused by Gibson's employment. Rather, according to Dr. Draur, Gibson's heart attack was the result of a coronary atherosclerotic disease, so that a heart attack might occur "at any time and it could be with or without any significant exertion."

In myocardial infarction cases the issue is whether the injury arises out of and in the course of employment and that issue must be determined by the facts of each case. There is no fixed formula by which the question may be resolved. Reis v. Douglas County Hospital, 193 Neb. 542, 227 N.W.2d 879. In the "heart cases" the problem is causation, and whether the injury is the result of personal rather than employment risk. The presence of a preexisting disease or condition enhances the degree of

proof required to establish that the injury arose out of and in the course of employment. Brokaw v. Robinson, 183 Neb. 760, 164 N.W.2d 461.

*Hyatt v. Kay Windsor, Inc.*, 198 Neb. 580, 583, 254 N.W.2d 92, 95 (1977). Further, as expressed by this court in *Doty v. Aetna Life & Casualty*, 217 Neb. 428, 435, 350 N.W.2d 7, 10 (1984): "Where the record presents nothing more than conflicting medical testimony, this court will not substitute its judgment for that of the compensation court."

Entering into a resolution by the Workmen's Compensation Court regarding any conflict of evidence are factors such as the respective interests of the parties in the lawsuit; demeanor of witnesses, including the parties, while testifying before the court; the apparent fairness exhibited by the witnesses; the extent to which the testimony of the various witnesses was corroborated; and the reasonableness or unreasonableness of statements of such witnesses. [Citation omitted.] Factual determinations by the Workmen's Compensation Court will not be set aside on appeal unless such determinations are clearly wrong. [Citations omitted.] Regarding facts determined and findings made upon rehearing in the Workmen's Compensation Court, § 48-185 precludes the Supreme Court's substitution of its view of facts for that of the Workmen's Compensation Court if the record contains evidence to substantiate the factual conclusions reached by the Workmen's Compensation Court.

*Thompson v. Monfort of Colorado, ante* p. 83, 86-87, 375 N.W.2d 601, 603-04 (1985).

The record contains sufficient evidence to allow the Nebraska Workmen's Compensation Court to accept one physician's opinion over another's as an answer to the question concerning causation of Gibson's disabling heart attack. Factual determinations and findings made by the compensation court in this case are not clearly wrong. Therefore, the decision and judgment of the Nebraska Workmen's Compensation Court are affirmed.

AFFIRMED.